IgGOTHARD, Judge.
In this criminal matter defendant, Robert Roussell, appeals his conviction and sentence resulting from a charge of simple burglary of an inhabited dwelling in violation of LSA-R.S. 14:62.2. For reasons that follow, we affirm.
The record before us shows that defendant was charged by bill of information along with a co-defendant, Rodrigo Conner, with the crime in connection with a burglary at the apartment of Paquita Hardin on March 8, 1999.[1] After a jury trial, defendant was found guilty as charged and in due course sentenced to serve twelve years at hard labor, the first year to be served without benefit of parole, probation or suspension of sentence. The | ¡^defendant objected to the sentence on the ground that it was excessive, and later filed a written motion to reconsider sentence. That motion was denied. He also filed a motion for appeal.[2]
Subsequently, the state filed two bills of information charging defendant with being a fourth felony offender. Defendant denied the allegations in the last-filed multiple bill, and filed a written response to the bill. After a hearing on the matter, the trial court determined defendant was properly advised of his constitutional rights as set forth in the minute entries and/or commitments, and waiver of rights forms. Accordingly, the court found sufficient evidence that the predicate pleas were constitutionally valid. The trial judge further found sufficient evidence to support the adjudication, as alleged from the expert and documentary fingerprint evidence presented. After adjudicating defendant as a multiple felony offender, the trial court vacated the previous sentence and sentenced defendant to life in prison without benefit of parole, probation, or suspension of sentence.
FACTS
At the trial on the merits, the state sought to prove that the two defendants, together with two accomplices, kicked in the front door of Paquita Harden’s apartment with the intent to commit a theft or felony therein. The state also sought to prove that defendant, a principal, was the lookout. In order to do so, the state presented evidence from Tammy Gordon, who testified that she lives next door to Ms. Harden’s apartment. |4The apartment building is a one-story building with two apartments in the front and two in the rear of the building. Ms. Gordon’s apartment and Ms. Harden’s apartment share a common wall. At about 12:50 p.m. Ms. Gordon was at home watching television when she heard a loud noise, which sounded like someone kicking in the door. She *813 also heard ransacking in the apartment with drawers being opened. Ms. Gordon stated that it sounded like someone was tearing down walls and clanging clothes hangers. Ms. Gordon called Ms. Harden, but no one answered. Because she was unable to reach her neighbor Ms. Gordon called the police, who arrived within two to three minutes. She looked out of her front window and saw no one. She also stated that the parking lots in front of her building and surrounding buildings were empty.
Ms. Gordon testified the victim’s brother also spent time in the apartment, and stated that she had seen his car, a burgundy Camry, earlier that morning. She heard the brother leave around 11:15 to 11:30. Ms. Harden left early that morning.
Ms. Harden testified that she lived in Apartment D, a front apartment on Pailet Street. In March, she lived with her two children in the apartment. She also stated that her brother, Mohammed Jones, had a key and stayed there occasionally. She was aware her brother was at her apartment on the day of the incident, but she was not present when her brother was there. She stated that at the time of the burglary, no one was at home.
When she returned home after the incident she found her apartment ransacked. Her sofa was overturned and the air conditioner was broken. |sCIothing was scattered around the apartment. She testified that was not the condition of her apartment when she left that day. The cloth covering the bottom of the sofa was torn and the sofa’s springs were broken. She did not have anyone examine the sofa to determine if it could be repaired, she discarded it. Photographs of the condition of the apartment after the incident were shown to the jury and introduced into evidence.
Ms. Harden further testified that, although her furniture was damaged and much of it had to be replaced, nothing was taken from her apartment. The items replaced included the sofa, loveseat, tables, and coffee table. She stated she did not give these individuals permission to damage her apartment or to be inside the apartment.
Ms. Harden further testified her television and stereo were thrown, but not taken. It appeared that someone was searching the apartment in order to steal something. She explained that she routinely hid items because this incident was not the first. However, she knew of no reason someone would come to her apartment and merely turn furniture upside down.
When she left the apartment that day, no one was in the apartment. She surmised that the robbers could not remove anything from the apartment because of the policemen’s timely arrival. She assumed her brother knew the co-defendant, Conner, because she heard her brother tell police officers that Conner paged him and her brother returned the call. However, she knew nothing about the relationship between the two men. She learned Conner’s name the date of the incident, when she heard his name mentioned at the scene.
IfiMs. Harden testified that the only item her brother had in the apartment was a gun which was kept in a plastic cabinet in her bedroom, where she kept her baby’s clothes. The gun was located on top of a high cabinet. After the entry, the gun was not in the same location. Instead, police discovered it in a box near the door.
She further testified that two or three weeks before the incident, she saw the co-defendant in front of her complex in a four-door, teal blue car. At the time she saw him, she did not know his name.
Deputy Joseph Ortega testified he responded to the call from Ms. Gordon, at approximately 12:53 p.m., arriving at the location approximately two minutes later. Deputy Ortega explained that Apartments A and D are in the front, and B and C are in the rear. A yard and a cemetery are *814 behind the rear apartments. Directly behind the apartment complex is another residence, and there is another set of houses before the street. When he arrived, he saw Deputy Ragas, who arrived approximately 15 to 20 seconds earlier. Deputy Ragas had walked to the rear of the complex in search of the correct apartment. Deputy Ortega came in contact with Conner shortly thereafter. Approximately 30 minutes after his arrival, Ms. Harden arrived.
Deputy Ortega testified that when he approached the apartment, Deputy Ragas’ car was on the side of the apartment. Defendant was standing approximately three feet from the doorway of Apartment D at the corner of the apartment building when Deputy Ortega started walking up to the apartment. Deputy Ortega stated that initially he did not think defendant was involved in the burglary. Defendant walked around the side alley of the complex. As he did so, Deputy Ortega saw the door close and [7three black males exit the apartment. One of the men walked to the left of the apartment and stopped. The other two walked down the street. At the time, Deputy Ortega was only a “matter of feet” from Apartment D. After he verified that the apartment he witnessed the men leaving was the correct apartment, the deputy followed and apprehended two of the three men he saw exiting the apartment. He was unable to catch the third because that man went in a different direction. Defendant was apprehended shortly afterward. Thus, only three of the four total suspects, one of whom was a juvenile, were apprehended.
Deputy Ortega noticed the front door of the apartment was kicked in. There was a footprint on the door and the doorframe was broken. The apartment looked ransacked.
When defendant saw Deputy Ortega approach, defendant 'walked to the rear of the apartment, down the alley. After defendant and the co-defendant were arrested, spectators yelled that defendant was involved in the crime. Defendant was apprehended on 14th Street, a street which is near to and which crosses Pailet. Nearby a gun was found inside a fenced yard. The gun, a MAC 11 9mm, was in a firing position and loaded. Fingerprint analysis of the gun was inconclusive. The fingerprints lifted from the apartment were also insufficient for comparison.
Deputy Ortega testified that he did not consider it unusual that the men exiting the apartment were carrying no items, since the officers pulled up at that time. He surmised the men were primarily concerned with escape.
| sDeputy Joseph Ragas testified that when he parked his unit, he saw a male come out of the front door of the apartment. At that time, the deputy did not realize this was the apartment in question and he went to the back of the building thinking the proper apartment was in the rear. He identified defendant as the person he saw come out of the door of the ransacked apartment, although on cross-examination the deputy admitted that he did not actually see defendant close the door. Once he learned which was the proper apartment, he realized this was the apartment he saw defendant leaving. The defendant was apprehended on 14th Street, walking near a fence.
Defendant attempted to explain his presence in the area. Deputy Ragas asked defendant to step to his unit and defendant complied. Defendant said, “What are you doing? I am just going to my car, it broke down I have been sleeping in it all night.” There were two cars parked on 14 th street, and defendant’s comment was directed to the teal-colored car, the car facing forward. Deputy Ragas explained that this car was later determined to be connected to Conner, not defendant.
Bienta Coleman testified that she is Conner’s girlfriend. She stated that she observed Conner and Jones laughing and exchanging telephone numbers after which *815 they agreed to a meeting. Conner subsequently borrowed her car, a blue Sunbird, on March 8, 1999. Conner left around 11:00[3] that day. Later Ms. Coleman’s car was found, not in working order, at the crime scene. She testified that she did not drive her car the morning of the incident.
|flBruce Tigler testified he resides at 1016 Pailet Street. On March 8, 1999, he arrived home from work and saw defendant standing by a tree, twelve feet away from the door of the burglarized apartment. He was uncertain of the time. He further testified that defendant has relatives nearby.
Tyrone Hodges, Sr. testified he resides on Pailet Street at the corner of 14 th Street. Although he testified he saw defendant on March 8, 1999, he later admitted he did not recall the exact date that he saw defendant. One day, while Mr. Hodges and his wife were leaving for lunch, Mr. Hodges noticed that defendant was in his path as Mr. Hodges backed out of his driveway between 11:30 a.m. and 12:00 p.m. Defendant told Mr. Hodges that he was having trouble with his car, a navy blue car, which appeared to the witness to be a Pontiac. Because it did not appear that defendant needed assistance, Mr. Hodges left.
Mr. Hodges testified that, although he does not see defendant on a regular daily basis, he recognized him because defendant has relatives who live in the area.
Conner testified that he did not know defendant. On March 8, 1999, Conner dropped off his girlfriend and spoke to Jones. On that day, he went to the apartment complex to try to locate a dark blue Pontiac for a friend. He found the car parked on 14th Street. At that time Conner was driving a different car, the teal Pontiac Sunbird. When Conner saw the car he was attempting to locate on 14 th Street, he pulled up to the car, looked in, and saw that the door was locked. At this time, the juvenile was with him. He and the juvenile went to Jones’ residence, They paged Jones from “down the Imstreet.” Conner testified that he spoke to Jones earlier that morning and had arranged a meeting. When Jones returned Conner’s call, Conner told Jones he (Conner) was on his way.
When Conner arrived at the apartment and knocked on the door, the door opened. Conner stepped inside and saw the residence was ransacked. Conner went inside and said, “Mohammed, Mo, are you in here?” He got no answer. Conner testified that he was only there for less than two minutes and he backed out. Once outside, Conner saw the officers and told them which house was ransacked. He denied trying to run or evade the police. Conner also maintained that he did not see defendant standing anywhere near the apartment. He further testified that he does not know defendant.
When Conner approached the apartment, he did not hear any noises. He did see two police officers. One was coming from the rear, and one was exiting his car. Conner explained he only went up to the doorsill and did not enter the apartment.
LAW
In brief to this court, defendant argues the trial court’s instruction to the jury on the offense of criminal damage to property as a “felony therein” invited the jury to render a verdict without sufficient evidence. Defendant argues the trial judge erred in instructing the jury regarding simple criminal damage to property because there was no evidence presented at trial as to the value. Thus he contends that, by doing so, the trial court erroneously invited the jury to speculate in reaching its verdict, and the jury rendered a verdict without sufficient evidence. He further argues that when damage is valued at under $500, the offense of criminal damage to property is a Inmisdemeanor. Defendant maintains that the instructional error *816 involving the definition of the crime charged threatened defendant’s due process rights compelling reversal of the conviction and sentence.
In contrast, the state argues the jury instruction was proper. It argues that the jury was presented with evidence depicting the extent of the damage in the apartment, and it was within the province of the trier of fact to determine whether the elements of the crime were met. Furthermore, the state asserts there was no evidence the jury considered criminal damage as the felony element of LSA-R.S. 14:62.2 because the state also presented evidence of the specific intent to commit a theft inside of the residence, an element which would satisfy the requirements of the statute. Thus, the argument made by defendant that the jury was invited to render a verdict without sufficient evidence is speculative. Furthermore, the state argues that the third element required is not solely the intent to commit a felony, but instead it is also the intent to commit any theft therein.
LSA-R.S. 14:62.2 provides in pertinent part:
Simple burglary of an inhabited home is the unauthorized entry of any inhabited dwelling, house, apartment or other structure used in whole or in part as a home or place of abode by a person or persons with the intent to commit a felony or any theft therein, other than as set forth in Article 60 [aggravated burglary] [emphasis added].
Initially the trial judge, in addition to a charge on 14:62.2, only charged the jury regarding the definition of theft as provided in LSA-R.S. 14:67. After the jurors began deliberating, they indicated they had a question[4] regarding the charges. The trial judge stated, and the jury agreed, hgthat she would re-read the substance of the law on' simple burglary of an inhabited dwelling and the responsive verdicts, and she would only read the headings of the other charges and ask jury members which portions of these they wanted her to re-read.
The trial judge repeated the instructions on simple burglary of an inhabited dwelling and the responsive verdicts. After-wards, a juror asked if destroying property was considered a felony for purposes of 14:62.2. Defense counsel objected to the trial judge giving a charge other than the crime charged on the basis that it placed the determination of value within the province of the jury. The trial judge overruled the objection, noting that the theory was argued and evidence was presented on the issue. When the trial judge stated the jury could infer from the evidence that all of the property was destroyed, defense counsel objected. The trial judge explained that the determination of value was a factual determination. The trial judge did not comment on the evidence and did not give any indication to the jury that the jury was to presume the value was proven. She simply read the charge on simple criminal damage to property consistent with LSA-R.S. 14:56, defining for the jury the amount needed to prove a felony for the purposes of 14:62.2, as follows:
Simple criminal damage to property is the intentional damage of any property of another without the consent [of] the other. Except in circumstances which are not relevant here. Whoever commits the crime of simple damage to property where the value is less than $500 dollars, if found guilty is guilty of a misdemeanor with the damage amount to $500 dollars but anything $500 dollars or more if a defendant is found guilty, the defendant is found guilty of a felony.
|13The jury stated this was a satisfactory explanation, and returned to deliberations. Forty-five minutes later the jury returned with a verdict of guilty as charged.
In support of his position, defendant cites Sullivan v. Louisiana, 508 U.S. 275, *817 281, 113 S.Ct. 2078, 2082-2083, 124 L.Ed.2d 182 (1993), in which the court held that a constitutionally deficient reasonable doubt instruction required reversal of the conviction and the error was not amenable to a harmless error analysis. The Sullivan court reasoned there had been no jury verdict since a deficient reasonable doubt instruction vitiated all of the jury’s factual findings. In such a case, when a reviewing court can only engage in pure speculation of what a reasonable jury would have done, the wrong entity finds defendant guilty. Id. 508 U.S. at 280, 113 S.Ct. at 2082. The Sullivan Court explained:
Insofar as the possibility of a harmless-error review is concerned, the jury-instruction error in this case is quite different from the jury-instruction error of erecting a presumption regarding an element of the offense. A mandatory presumption — for example, the presumption that a person intends the ordinary consequences of his voluntary acts — violates the Fourteenth Amendment, because it may relieve the State of its burden of proving all elements of the offense. But “[w]hen a jury is instructed to presume malice from predicate facts; it still must find the existence of those facts beyond a reasonable doubt.” And when the latter facts “are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed.” A reviewing court may thus be able to conclude that the presumption played no significant role in the finding of guilt beyond a reasonable doubt. But the essential connection to “beyond a reasonable doubt” factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates all the jury’s findings. A reviewing court can only engage in pure speculation — its view of what a reasonable jury would have done. And when it does that, “the wrong entity judge[s] the defendant guilty.”
| 508 U.S. at 280-281, 113 S.Ct. at 2082 (citations omitted) (emphasis in original) (quoting Rose v. Clark, 478 U.S. 570, 578, 580, 106 S.Ct. 3101, 3106, 3107, 92 L.Ed.2d 460 (1986), and Carella v. California, 491 U.S. 263, 271, 109 S.Ct. 2419, 2423-2424, 105 L.Ed.2d 218 (1989) (SCALIA, J. concurring in judgment)).
In the instant case, defendant does not argue the instruction was erroneous regarding the burden of proof, but argues instead that the instruction misled the jury to find damages had been proven when the record was allegedly devoid of any evidence of the amount of damages. Thus, defendant appears to argue that the instruction created a presumption that damages were proven, without the necessity of the determination of the facts. That approach fails since the trial judge did not instruct the jury to presume damages were proven. The jury’s instructions on the proper burden of proof were not changed when the trial judge gave the instructions on simple criminal damage to property. Accordingly, we find Sullivan v. Louisiana, supra, distinguishable.
In Chapman v. State of California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), the court held that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. The record facts herein meet the Chapman analysis.
The jury herein was given two bases for finding guilt, namely, to find the intent to commit a felony or a theft. If the jury found either an intent to commit a felony or a theft and that finding was erroneous, the proper question is whether there was sufficiency of the evidence. In the instant | incase, the jury could have found defendant guilty of simple burglary of an inhabited dwelling by finding he intended to commit a theft or a felony. A jury is not constitutionally required to *818 agree on a single theory to convict a defendant where it is instructed as to alternative theories. State v. Vergo, 594 So.2d 1360, 1364 (La.App. 2 Cir.1992), writ denied, 598 So.2d 373 (La.1992) (relying on Schad v. Arizona, 501 U.S. 624, 630, 651-652, 111 S.Ct. 2491, 2496-2497, 2506-2507, 115 L.Ed.2d 555 (1991), reh’g denied, 501 U.S. 1277, 112 S.Ct. 28, 115 L.Ed.2d 1109 (1991)).
Under LSA-C.Cr.P. art. 802, the trial court is required to charge the jury as to the law applicable to the case. In the instant case, we find the trial judge properly advised the jury as to the law as required by Article 802. Moreover, defendant’s complaint that there was no evidence of the value of the property is more properly an argument regarding the sufficiency of the evidence.
In the instant case there is no evidence of value of the items destroyed in the burglary. Thus, had the jury relied solely on proof of simple criminal damage to property, defendant’s argument would be persuasive. However, the jury was also presented with the alternative theory of intent to commit a theft and could have determined there was sufficient proof for this theory.
In reviewing claims challenging the sufficiency of the evidence, this court must consider “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) 11fi(emphasis in original). See also, LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308, 1309 (La.1988).
A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure that the defendant has received due process of law. State v. Bordenave, 95-2328 (La.4/26/96), 678 So.2d 19, 20 (quoting Jackson, 443 U.S. at 319, 99 S.Ct. at 2789). It is not the function of an appellate court to assess credibility or reweigh the evidence. Appellate review for minimal constitutional sufficiency of evidence is a limited one restricted by the standard developed in Jackson v. Virginia, supra. State v. Rosiere, 488 So.2d 965, 968 (La.1986) (and the cases cited therein).
LSA-R.S. 15:438 provides that when evidence is circumstantial, the applicable rule is that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” In State v. Rosiere, supra, 488 So.2d at 965, 968, the Louisiana Supreme Court explained:
This is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden.
As stated in State v. Pascual, 98-1052, p. 6 (La.App. 5 Cir. 3/30/99), 735 So.2d 98, 101:
|17It is the role of the fact finder to determine the weight of the evidence and the jury may accept or reject, in whole or in part, the testimony of any witness. The appellate courts may not second guess the jury’s rational credibility determinations (citation omitted).
Defendant was additionally charged as a principal. LSA-R.S.14:24 defines principals as:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or *819 indirectly counsel or procure another to commit the crime, are principals.
Defendant was at the door of the apartment at the time the crime was committed; shortly thereafter, he walked away when the officers arrived. His explanation for his presence in the area at the time, that his car broke down, and he slept in the car, was contradicted by Conner, who testified he (Conner) drove the teal car during the period in question. Additionally, although defendant had relatives in the area, none were reported to live in that complex. The jury, after making a credibility determination, could have concluded every reasonable hypothesis of innocence was excluded and defendant was a principal.
In State v. Richardson, 547 So.2d 749, 750, 752 (La.App. 4 Cir.1989) (cited with approval in State v. Tran, 97-640 (La.App. 5 Cir. 3/11/98), 709 So.2d 311, 317), the court considered the issue of whether circumstantial evidence sufficiently proved the intent to commit a theft when, as in the instant case, no item was missing from the house. The court concluded the physical evidence inside the house indicated the intent to commit a theft. The evidence consisted of the physical damage to a window, a door, and an air-conditioning unit, implying an unauthorized entry. The disarray of 11Rpersonal possessions from the bedroom closet to the kitchen floor evidenced inspection and examination of property prior to actual removal. The court opined that the only rational interpretation was that defendant broke into the home to steal the property. It concluded that the evidence excluded the reasonable hypothesis of innocence that defendant entered the home mistakenly or negligently. The court determined that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded that defendant possessed the necessary specific intent to commit a felony or theft inside the home.
In State v. Tran, supra, defendant argued that he was not found in possession of the victim’s property and this court noted that LSA-R.S. 14:62.1 does not require proof of possession of stolen goods. Id. 97-640, 709 So.2d at 317. In that case, this court held:
In order to convict an accused of simple burglary of an inhabited dwelling, the state must prove, (1) there was an unauthorized entry; (2) the structure was inhabited at the time of entry; and (3) defendant had the specific intent to commit a felony or theft inside the structure. To satisfy the unauthorized entry element, the state must prove that the defendant did not have permission to enter the premises. Id. 97-640, 709 So.2d at 316-317 (citations omitted).
In the instant case, the state presented evidence through Ms. Harden’s testimony that she did not know defendant, and that defendant did not have permission to enter her apartment. The footprint on the door, and the loud noises Ms. Gordon heard are also indicative of unauthorized entry. Further, the officers directly linked defendant to the scene.
Conner testified Jones invited him. However, the evidence of a loud noise sounding like the door was being kicked open and the footprint on the Indoor are inconsistent with someone entering the house on invitation. See, State v. Shaw, 30,477, (La.App. 2 Cir. 2/25/98), 708 So.2d 509, 511.
Given the evidence presented to the jury, we believe the jury could have found sufficient evidence supporting the alternative theory of intent to commit a theft.
This assignment is without merit.
The defendant alsaxequests a review of the record for errors patent on the face of the record. We have conducted such a review and find the following.
At the original sentencing, the trial judge advised defendant' he had three years to. file a petition for post-conviction relief. However, the trial judge failed to accurately state the proper requirement *820 that the prescriptive period begins after the judgment of conviction and sentence has become final.
At the multiple offender hearing the trial judge did not inform defendant of the prescriptive period. LSA-C.Cr.P. article 930.8.
Additionally, at the time of sentencing, Article 930.8 provided for a three-year prescriptive period. However, that article has been recently amended by 1999 La. Acts No. 1262, effective August 15,1999, to provide for a two-year prescriptive period.
Regarding the former article, the Louisiana Supreme Court in State ex. rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189, 1192, considered whether the newly enacted prescriptive article, which became effective on October 1, 1990, had prospective application to defendants whose convictions and sentences became final after the effective date of the | ^article. Therein the court held that the newly enacted prescriptive period was not an ex post facto law violative of the United States and the Louisiana Constitutions. Id., 660 So.2d at 1200, 1201, 1202. Thus, the new prescriptive period of two years applies to defendant herein.
Accordingly, we instruct the trial court to inform the defendant of the correct provisions of LSA-C.Cr.P. article 930.8 by sending appropriate written notice to him within ten days of this opinion, and to file written proof in the record that defendant received such notice. State v. Williams, 98-651, (La.App. 5 Cir.2/10/99), 729 So.2d 14; State v. McIntyre, 97-876 (La.App. 5 Cir. 1/27/98), 708 So.2d 1071, writ denied, 98-1032 (La.9/18/98), 724 So.2d 753.
For the foregoing reasons, the defendant’s conviction, adjudication as a multiple felony offender, and sentence are affirmed with instructions to the trial court regarding the notification of the prescriptive period as discussed herein.
CONVICTIONS, ADJUDICATION AS AN HABITUAL OFFENDER AND SENTENCE AFFIRMED, WITH INSTRUCTIONS.

. Both defendants were trial jointly, however, this appeal was taken only by Robert Rous-sell.

. We note that the motion for appeal was filed prematurely since it was filed before the adjudication on the multiple offender bill. However, that procedural defect is cured by the subsequent re-sentencing. State v. Bagemehl, 98-1134 (La.App.5 Cir. 5/19/99), 737 So.2d 228.

. It was not specified if the time was a.m. or p.m.

. The attorneys waived the presence of their clients for the purposes of these questions.