# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 16-226

**STATE OF LOUISIANA**

**VERSUS**

**CODY KEITH FONTENOT**
**A/K/A CODY FONTENOT**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 101208-FB
HONORABLE CHUCK RANDALL WEST, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of James T. Genovese, Phyllis M. Keaty, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Annette Roach**
**Louisiana Appellate Project**
**P. O. Box 1747**
**Lake Charles, LA 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Cody Keith Fontenot**

**Trent Brignac**
**District Attorney**
**Thirteenth Judicial District**
**Julhelene E. Jackson**
**Assistant District Attorney**
**P. O. Drawer 780**
**Ville Platte, LA 70586**
**(337) 363-3438**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**SAVOIE, Judge.**

On September 2, 2014, the Defendant, Cody Keith Fontenot a/k/a Cody Fontenot, was charged by bill of information with one count of simple burglary, a violation of La.R.S. 14:62; and one count of theft of a motor vehicle, a violation of La.R.S. 14:67.26. The Defendant pled not guilty to the charges on September 25, 2014. Thereafter, on February 2, 2015, an amended bill of information was filed to specify the value of the motor vehicle stolen in count two as $1,500.00 or more. The Defendant pled not guilty to the amended bill on August 4, 2015. On that same date, the Defendant's trial by jury began, and, on August 5, 2015, the jury returned a verdict of guilty on both counts. Defense counsel moved for a post-verdict judgment of acquittal based on the lack of expert or appraisal evidence as to the value of the motor vehicle. The trial court denied the motion.

On November 19, 2015, the trial court sentenced the Defendant to twelve years at hard labor and a $1,500.00 fine for simple burglary. On the charge of theft of a motor vehicle valued at $1,500.00 or more, the trial court sentenced the Defendant to ten years at hard labor and a fine of $1,500.00. The trial court ordered five years of the theft of a motor vehicle sentence to run consecutively to the sentence for simple burglary.

The Defendant filed a motion for appeal, which was granted. He alleged three assignments of error regarding the sufficiency of the evidence and the ineffective performance of counsel. For the following reasons, we affirm.

**FACTS**

In June 2014, a 1999 GMC truck was stolen from Robert Manuel's place of business. The Defendant was originally named as the perpetrator by his then-girlfriend, Sara Navarre. Recanting her initial statement, Sara (now the

Defendant's wife) stated at trial that she was the person who stole the truck and that she initially blamed the Defendant to force him into drug rehab.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

**ASSIGNMENTS OF ERROR NUMBERS ONE AND TWO**

In these assignments of error, the Defendant contends that the evidence was insufficient to support his convictions of simple burglary and theft of a motor vehicle valued at $1,500.00 or more. Appellate counsel asserts error as to both the credibility of the State's main witness, Sara Navarre, and insufficiency as to the elements of both offenses.

*Legal Analysis*

The analysis for insufficiency of the evidence claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

2

The first witness to testify for the State was Marie Potter, a former detective with the Mamou Police Department. On Monday, June 30, 2014, Detective Potter was contacted by Sara Navarre. Detective Potter picked Sara up and brought her to the police station. When asked what Sara told her, Detective Potter responded:

> Um that her boyfriend at the time uh it was her boyfriend Cody had she had [sic] brought him to the Ville Platte area to steal a truck a few days before like during the weekend and um that she dropped him off and that he stole the truck and she told me that uh he parked it at Town Foods which is a store catty-corner from where her apartment was and she said that at one point he parked it at her apartment and she told him that he could not park it there because she knew it was stolen. She didn't want to get in trouble. So he moved it to a house which is a like a block over maybe and it was a house that he was doing uh some kind of construction work at. And um then I called in actually when I found out where it was stolen, that's when I called in Detective Albarado because he . . . it's actually his jurisdiction where it was stolen.

According to Detective Potter, Sara called the victim of the theft "Uncle Bob."

When asked if she was able to verify the things Sara said, Detective Potter replied:

> Yes I did. I called patrol, which happened to be Chris Paul. Um asked him if he could go check out that area and see if there was in fact a truck there while I was in the office with Sarah [sic] and he called back and he stated that there was in fact a truck there.

According to Detective Potter, all of the information given to her by Sara checked out. Detective Potter testified that Sara relayed the same information to Detective Justin Albarado and that Sara actually wrote a handwritten statement. Sara, however, tore up the handwritten statement.

While Sara was present with Detective Potter and Detective Albarado, the Defendant called her. Sara put the phone on speakerphone so the detectives could hear the conversation. Detective Potter relayed the conversation as follows:

A. Um it was her saying to him that she was at the Police Department and that she had told them about him stealing Uncle Bob's truck and he asked her what all did she tell us and she told him that she had told us everything.

Q. About the truck?

A. Yes. And she asked him to come turn himself in and but he said no.

Q. And you heard that on speakerphone?

A. Yes.

On cross-examination, Detective Potter admitted couples often will accuse each other and then later change their stories. Detective Potter also testified she had seen family members attempt to press charges against someone as leverage to get that person into rehab. According to Detective Potter, she had seen this type of thing happen quite a lot. When asked if she would describe Sara's life as "pretty tough" over the last few years, Detective Potter answered, "Based on my observation, yes." The following colloquy took place as to Sara's statements regarding the Defendant's drug addiction:

Q. Now isn't it true when Sara came to you she brought up that she felt that her at the time live in boyfriend Cody was suffering from serious drug addiction?

. . . .

A. Yes she did.

Q. Okay. And in fact she preference [sic] and by preference [sic] I mean started the whole meaning of the conversation with a proposition, Cody is bad on drugs, Cody is hooked on drugs, I need to force him to get some help. Isn't that accurate?

A. She did not say that she needed to force him to get help. Do you want me to say what she said?

Q. Yea. Go ahead.

4

A.     She said that he was on a three[-]day crystal meth binge and that he had been stealing and robbing and stole a truck to do it and that she wanted him to get some help and that she was scared of him because of his drug addiction.

Q.     So and I will rephrase the question. When she came to you in the very beginning[,] she said the reason she was there or part of the reason she was because she wanted to force him to get help for his drug problem correct?

A.     No. She ever [sic] said that. She never said she wanted to force him to get help. She said that she was worried about him[.] [S]he uh I'm not gonna say that she said that[.] [S]he didn't say that but what she did say was that she was worried about him being on the drugs and doing all these crimes and that is why she came to me because she did want help for him[,] but she didn't say I don't want to say she said she wanted to force him.

Detective Potter testified that she was aware Sara completely changed her statement later on. When asked if it was possible Sara stole the truck and blamed the Defendant, Detective Potter answered, "Based on what I handled with the case, 'No,' because I listened to him on the phone." Detective Potter explained she heard the Defendant admit "it" to Sara on the phone, so she had no reason to disbelieve Sara.

On re-direct, Detective Potter agreed Sara's initial statement was corroborated by physical evidence, i.e., the truck was stolen, and the truck was exactly where Sara said it would be. When asked if, based on her experience, Sara's first statement appeared to be truthful, Detective Potter replied, "Yes." Finally, Detective Potter testified that she knew it was "Cody" that called Sara while Sara was at the police station because Detective Potter recognized his voice.

Christopher Scott Paul, a former officer with the Mamou Police Department, was working as a Lieutenant Patrol Supervisor on June 30, 2014. Lieutenant Paul received a call from Detective Potter on June 30, 2014, to conduct a search between the graveyard and a patch of woods on East Street to see if there was a

5

white GMC. Lieutenant Paul found a 1999 white GMC pickup truck at that location. The truck was registered to Robert S. Manuel. At Detective Potter's instruction, Lieutenant Paul had the truck towed and placed it on hold for investigation. Lieutenant Paul looked for the keys to the truck, but he could not remember if he found them. The tow truck operator also looked for the keys, but Lieutenant Paul could not recall if she found any.

The next witness to testify, Eric Fruge, worked for the Evangeline Parish Sheriff's Office. On June 30, 2014, Officer Fruge received a call that a vehicle belonging to Mr. Bob Manual had been stolen. Mr. Manuel first noticed the vehicle was stolen when he returned home from a trip on Monday afternoon. Mr. Manuel told Officer Fruge that, when he left on Friday, the truck was parked with the other parked vehicles. When asked if the keys to the truck were located in the truck or somewhere else, Officer Fruge testified Mr. Manuel was not sure. Officer Fruge refreshed his memory by looking at his report and then testified that Mr. Manuel said the keys to the "trucks" were located in a lockbox inside his warehouse. According to Officer Fruge, the lockbox contained multiple keys, and Officer Fruge saw more than one truck on Mr. Manuel's property. According to Officer Fruge, Mr. Manuel had a warehouse where he kept his equipment and vehicles. Mr. Manuel also had a big storage warehouse in which he kept supplies and a lockbox. Officer Fruge investigated the scene but saw no signs of forced entry. On cross-examination, Officer Fruge testified that there was no break-in because he did not see any damaged property.

Justin Albarado, a former detective with the Evangeline Parish Sheriff's Office, spoke with Detective Potter and Sara Navarre on June 30, 2014. Detective Albarado was present when Sara spoke with Detective Potter. When asked what

Sara said about the burglary of Mr. Manuel's property, Detective Albarado testified:

> A. She just states that she was the one that dropped the defendant off and from there he returned later that evening with a truck matching the description of the … belonging to Mr. Manuel. She told him to leave from there. He parked it at an abandoned store, which is close to where they lived at the time. She states from then, that he came the next, yeah the next evening with the truck. Excuse me later that evening with the truck and actually had it parked at the home. Then he came back the following night and was knocking on the door pretty late in the late evening hours. Wanting to come inside, then [sic] from then she asked where the truck was[,] and the defendant explained to her where it was parked.
>
> Q. Okay. Um and if you could just give us a timeline. I'm trying to um you were talking to her on the 30th on the Monday correct[,] and if she is talking about events over a two-day period that would be the Sunday and a Saturday?
>
> A. The weekend prior.
>
> Q. The weekend?
>
> A. Yes sir.
>
> Q. Did you ever go to the scene where the truck was located?
>
> A. I went after uh I went after, I had spoke to Ms. Navarre. Just to go pass and see the location. The vehicle was no longer there. It was already towed and taken to Car Care.
>
> Q. And what if you could describe to the jury the location where the truck was found?
>
> A. Just a small patch of woods, like a farm field that wasn't to [sic] far from the ball field. Which is located in Mamou.

When asked if he ever looked into the fact that Sara stole the truck instead of the Defendant, Detective Alabarado said, "No." When asked if Sara told him she was doing "all this" to get the Defendant treatment for his drug problem, Detective Albarado responded, "That and among other things." Detective Albarado admitted

7

he had no photos of the stolen truck. When asked about taking fingerprints, Detective Albarado testified:

> I'm gonna tell you again sir. I did not take fingerprints for the simple matter that everything went towards Mr. Fontenot. I did not have a bunch of people to go on and once again it was a work truck, so therefore would we have [sic] had the time frame to do all the fingerprints.

According to Detective Albarado, nothing pointed him in a different direction from the Defendant. Finally, the following colloquy took place:

> Q. If she [Sara] comes and recants what she told you because you have no physical evidence to corroborate. Is it possible that the results of your investigation are wrong?
>
> A. Yes sir.

On re-direct, Detective Albarado gave the following testimony as to what he learned after talking to the owner of the truck, Mr. Manuel:

> A. Cause like I said when Mr. Fontenot came to my, excuse me[,] Mr. Manuel came to my office. He stated that while he was gone away from his home. Mr. Fontenot was there trying to sell him a golf cart charger. Okay. When he came back from his vacation the golf cart charger was there. So that puts Mr. Fontenot at the location. Calling Mr. Manuel from his home the weekend that the vehicle went missing. So that puts him at the scene of the crime. Not once [b]ut twice because later Ms. Navarre dropped him in the facility [sic] of that area.
>
> Q. And didn't Mr. Manuel tell you that he told Mr. Fontenot that he wasn't interested in the cart charger cause he was not there that weekend to buy it?
>
> A. Yes. That is correct.
>
> Q. So Mr. Fontenot knew Mr. Manuel wasn't there?
>
> . . . .
>
> A. Yes.
>
> Q. So that's the other part of the investigation. It's not just …
>
> A. Ms. Navarre's…

Q. Ms. Navarre's statement correct?

A. Correct.

Q. In fact Mr. Manuel's, what you learned from Mr. Manuel in the course of your investigation corroborated everything provided to you by Ms. Navarre correct?

A. Yes sir.

Detective Albarado agreed that his investigation corroborated Sara's statement as to how the truck was stolen and where the truck was located.

Robert Manuel, the owner of the stolen truck, stated that he also goes by the name of "Bob." Mr. Manuel owned a 1999 white GMC Sonoma pickup. When asked if he knew the Defendant, Mr. Manuel stated he was related to the Defendant and had known the Defendant since he was young. Mr. Manuel stated the Defendant had been to his residence and had actually worked for him at one time. When asked if the Defendant was familiar with where he kept his equipment, Mr. Manuel replied, "I think so. His dad worked for me. He worked for me." As for the weekend of the theft, Mr. Manuel was contacted by the Defendant on Friday, June 27, to see if Mr. Manuel wanted to buy a battery charger that the Defendant no longer needed. Mr. Manuel was out of town, so he could not make a decision at that time. The battery charger was for a golf cart, which was parked in Mr. Manuel's driveway. When Mr. Manuel told the Defendant he did not know whether the battery charger would fit his golf cart, the Defendant told Mr. Manuel he knew it would fit because he was looking at the golf cart. Mr. Manuel thought the Defendant took the charger to one of his employees because the Defendant was trying to sell the charger that day.

According to Mr. Manuel, his employees normally parked at the warehouse. All of his employees were instructed to put the keys to the vehicles in a key box in the warehouse. Mr. Manuel was not sure if the key box was being used when the Defendant worked for him. Because the employees left around noon on Friday, Mr. Manuel guessed there were no employees on the property when the Defendant called him about the charger. Mr. Manuel testified that the Defendant did not have permission to be on the property. In fact, Mr. Manuel testified that no one was allowed on his property when he was not there. When asked if his warehouse was normally locked, Mr. Manuel stated it was supposed to be locked, but it was often left unlocked. Thus, Mr. Manuel agreed that his warehouse could be accessed to steal a key without any forced entry. Mr. Manuel stated he knew of no way to start the truck without a key.

Mr. Manuel learned his truck had been stolen when the sheriff's office called him. Mr. Manuel went to look for the GMC Sonoma and saw that it was missing. Mr. Manuel had purchased the truck for his son-in-law to use, and the truck was returned to him when his son-in-law no longer needed it. According to Mr. Manuel, in June 2014, the truck ran well, had four good tires, had a working air conditioner, and had all systems working. Mr. Manuel looked on the NADA (National Automobile Dealers Association) website, which estimated the truck to be worth about $1,800.00. Mr. Manuel believed he paid around $2,100.00 for the truck.

On cross-examination, Mr. Manuel agreed that the Sonoma was a base model truck. Mr. Manuel also agreed no one at the sheriff's office asked him how much the truck was worth, and no one asked him about the truck's mileage. When

asked about the truck's mileage, Mr. Manuel estimated "160."  When asked about

the condition of the truck, Mr. Manuel stated:

> A.  Yeah.  I guess this really wasn't a work truck.  I mean it was my son in laws I brought it back in kind of just to just use as a spare in case we needed something to run a part to somebody or something.
>
> Q.  It's certainly not keep [sic] in the same condition as let's say your primary vehicle or your wife's primary vehicle?
>
> A.  No.  It was just a ...
>
> Q.  Now would it surprise you that NADA says that the rough trade in value of a 1999 model GMC Sonoma pickup half-ton rough trade in being one that has been used and is not in perfect condition?  With 160,000 miles is $1,400.00 dollars would that surprise you?
>
>    . . . .
>
> A.  No.
>
>    . . . .
>
> Q.  So would that surprise [sic] that again being $1,400.00.
>
> A.  No.  Not really not trade in.
>
> Q.  About how long have you had the truck?
>
> A.  Uh …
>
> Q.  More than three years?
>
> A.  Oh definitely more than three years.
>
> Q.  More than five years.
>
> A.  Probably around five.
>
> Q.  So you bought a truck for $2,100.00 hundred dollars more than five years ago.  Do you think it's possible that it depreciated more than $600.00 hundred dollars?  Cut down under $1,500.00 hundred?
>
> A.  Well yeah it's possible.
>
> Q.  So it is possible?
>
> A.  Yeah.

Q. So when you testified that you thought the truck was worth $1,800.00 hundred dollars. It is really possible that the truck could be worth less than $1,500.00 hundred dollars?

A. Yes. Anything is possible. I didn't uh … when I brought [sic] it I thought I had made a good deal on it. That's why I brought [sic] it. I think I was buying it under the value of what it was worth.

Mr. Manuel testified that it was not unusual for the Defendant to come on his property to sell him something. Mr. Manuel never told the Defendant he could not come on his property.

On re-direct, the following colloquy took place regarding the value of the truck:

Q. Let's talk about the value. I'm gonna use the same guides that Mr. Fuselier pulled up. Mr. Fontenot would it surprise you to know that the rough trade in is $1,400.00 dollars but the average trade in is $2,100.00 dollars. Does that sound about right?

A. Yeah. I mean I don't know.

Q. And a clean trade in is $2,675.00 dollars and a clean retail is $4,600.00 hundred dollars. So your estimate of $1,800.00 hundred dollars is on the low end correct?

A. Yeah.

Mr. Manuel agreed neither the Defendant nor anyone else had a free pass to go on his property anytime they wanted. When asked if the Defendant had permission to be on his property, Mr. Manuel replied, "No."

*Defense Witnesses*

The defense called Detective Albarado. When asked if he sought an appraiser to determine the value of the truck or if he tried to calculate the value through NADA, Detective Albarado stated that he did not.

The defense also called Sara, the Defendant's wife. When asked to explain the events related to Mr. Manuel's truck on the weekend in June 2014, Sara responded as follows:

> Okay. Um we well my husband Cody Fontenot um Cody had a drug problem um I tried to convince Mr. Cody to get help um which Mr. Cody never wanted to get help so I found away [sic] and actually I would say my plan was actually successful. I got what I wanted and it was wrong um I did … I took Mr. Bob Manuel's truck[,] and after I took his truck[,] um I made a statement with the police department[,] and I uh after I left the police department[,] I contacted my husband and I told my husband that the cops are looking for him for a stolen truck he was not aware of the situation. He did not know what was going on[,] and so I convinced him into getting into a rehab. To turn himself into a rehab um which he did, he got in touched [sic] with his probation officer[,] and he admitted that he had a problem. I got what I wanted out of the situation.

When asked specifically what she did when she took the truck, the following colloquy took place:

> A. Um the keys were in the truck. I took the truck[,] and I rode around for a while in the truck and till [sic] I could think it through of what I wanted to do with the truck[;] um actually I went park [sic] the truck um behind our old house in Mamou.
>
> Q. In Mamou?
>
> A. Yes sir.
>
> Q. Okay. Why on earth would you do this?
>
> A. Because he is my husband[;] he needed help you know… I knew that was the only way he never wanted to admit you know[;] I tried to talk to him about getting help[,] and um he would avoid the situation so that was my plan to do that you know to convince him to get some help.

Sara admitted that she initially told Detective Potter the Defendant took the truck, but Sara did not admit she told Detective Potter she was with the Defendant. Sara denied answering a phone call from the Defendant in Detective Potter's presence. Sara acknowledged that she was confessing to telling law enforcement a

13

lie, and she acknowledged that she could be charged. When asked if she changed her initial statement to police several months later, Sara replied, "Yes," and explained:

> Well I came up here I asked to talk with Mr. Marcus[,] and I went in the room[;] and I sat down[;] and I talked with him[;] and I told Mr. Marcus[;] and I apologized to Marie Potter for lying to her. Um and also Mr. Marcus I apologized and I told Marcus Fontenot exactly what I had done[,] and Mr. Marcus did not, did not want to believe me or whatever um but I did explain to him.

On cross-examination, Sara testified she waited until after her husband was finished with rehab to tell the truth about what happened. When asked if the Defendant got out of rehab in November 2014, Sara stated she did not remember. When asked if she waited until after she and the Defendant were married to go to law enforcement with her change in story, Sara replied, "Yes, I think so." According to Sara, she and the Defendant married on January 24, 2015, and the Defendant was scheduled for trial in February 2015. Sara finally went to the police with the "truth" only a few days before trial. Sara agreed that she originally told Detective Potter the Defendant stole the truck.

When asked what time she stole the truck, Sara answered that she was not sure of the exact date. Sara testified that she had the truck for two days before she contacted Detective Potter. Sara said no one was with her when she stole the truck. When asked who dropped her off, Sara replied, "I told you my sister, I explained all this to you that day I talked to you." Sara also testified that she was with the Defendant earlier that day when the Defendant called Mr. Manuel. After she reported the truck stolen to Detective Potter, she told the Defendant that the cops were after him for a stolen truck.

14

When asked if the truck had an automatic or standard transmission, Sara replied, "Standard." She described the truck as white with two doors and a regular cab. Sara acknowledged that she was pregnant.

The next witness for the defense, Detective Potter, testified that she was at a meeting with the District Attorney, attorney Bo West, and Sara in early 2015. At that meeting, Sara changed her story from what she told them previously. When asked if Sara said she stole the truck, not the Defendant, Detective Potter replied: "I would be lying if I said yes, I don't remember her saying that she did it. I do remember her trying to uh just take him out of the equation." According to Detective Potter, Sara told those present at the meeting that she was not being forced by the Defendant to change her testimony. On cross-examination, Detective Potter stated that she felt Sara's first statement taken on June 30, 2014, was truthful since it was corroborated by all of the evidence.

The State recalled Mr. Manuel on rebuttal. According to Mr. Manuel, the truck that was stolen had an automatic transmission.

*Defendant's Argument*

First, the Defendant argues the evidence was insufficient to prove his identity as the perpetrator. Although he acknowledges the initial statement of Sara points to him as the person who stole the victim's motor vehicle, the Defendant argues that Sara's initial statement was not sufficient to sustain his convictions because it was uncorroborated and inconsistent with her trial testimony. Additionally, the Defendant argues that Sara's testimony should be looked upon with "great caution" since she acted as his accomplice. Finally, the Defendant argues that Sara's trial testimony (wherein she stated she stole the motor vehicle in question) should be believed over her initial statement (wherein she stated the

15

Defendant stole the motor vehicle) since the trial testimony was given under oath. In its brief, the State argues that Sara's original statement to the detective was the truth and was sufficient to convict the Defendant of simple burglary.

When the key issue is the Defendant's identity as the perpetrator, "the State is required to negate any reasonable probability of misidentification." *State v. Williams*, 15-498, p. 5 (La.App. 3 Cir. 12/9/15), 181 So.3d 857, 862 (citing *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002)). "[P]ositive identification by only one witness is sufficient to support a conviction." *Id.*

Although the Defendant seems to concede that Sara's initial statement to police was sufficient to prove the Defendant was the perpetrator, he argues that Sara's initial statement should have been considered for impeachment purposes only and not as substantive evidence of the Defendant's guilt. Without Sara's initial statement to police, the Defendant claims the evidence boils down to:

> 1) a truck was found at a home where Cody had previously done construction work; 2) when the owner was contacted, he said he had not realized the truck was missing; 3) Cody Fontenot had talked to the owner a few days earlier and was told the owner was out of town for the weekend; 4) Cody Fontenot lived near where the truck was found.

The Defendant cites *State v. Wilson*, 50,418 (La.App. 2 Cir. 4/6/16), 189 So.3d 513, to support his argument that Sara's initial statement to police should not have been considered as substantive evidence of the Defendant's identity as the perpetrator. In *Wilson*, the defendant claimed the evidence was insufficient to prove he committed two counts of indecent behavior with juveniles because the juveniles recanted their prior statements at trial. *Id.* The court addressed whether

the juveniles' prior inconsistent statements could be considered as substantive evidence of Wilson's guilt:

> Although prior inconsistent statements may be used to impeach witnesses on the issue of credibility, they generally could not be used as substantive evidence of the defendant's guilt until the 2004 amendment of the LSA-C.E. art. 801(D)(1)(a). Article 801(D) now provides in pertinent part:
>
> > A statement is not hearsay if: 1. Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is:
> >
> > (a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness's attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement[.]
>
> Thus, under Article 801(D)(1)(a), a prior inconsistent statement is not hearsay and can be considered for the truth of the matter asserted, if the statement is corroborated. This court has noted that before such prior statements can be accepted as nonhearsay, and therefore probative, additional evidence must also corroborate the facts sought to be proved by these prior inconsistent statements.
>
> Uncorroborated hearsay evidence in the form of an out-of-court statement by a witness who later denies its truth, is not alone sufficient to sustain a criminal conviction. Thus, if there were no objections to the use of prior inconsistent statements during trial, and it is impossible to tell whether those prior inconsistent statements were introduced for impeachment purposes or for their assertive value, an attorney's failure to object does not prohibit review of the use of the prior inconsistent statement on appeal.

*Id.* at 527-28 (citations omitted). The court in *Wilson* found the prior inconsistent statements were not corroborated by additional evidence; thus, they should not have been admitted for their "assertive value." *Id.* at 528. Since the prior inconsistent statements were the sole substantive evidence of Wilson's guilt on both counts of indecent behavior with juveniles, the second circuit reversed Wilson's convictions and sentences for indecent behavior with juveniles. *Id.*

17

We find the present case to be distinguishable from *Wilson*. As Detective Potter testified, Sara's initial statement naming the Defendant as the perpetrator was corroborated by the fact that the truck was found in the place Sara said it would be found and by the conversation Detective Potter overheard between Sara and the Defendant. Additionally, the Defendant was at Mr. Manuel's house near the time the truck was stolen, and he knew that Mr. Manuel was out of town. The Defendant claims that these same facts corroborate Sara's recantation at trial. We agree, however, this does not discount the use of these facts to corroborate Sara's initial statement to police.

We find the present case to be more like *Williams*, 181 So.3d 857. As in the present case, Williams argued that the State's evidence was insufficient to identify him as the perpetrator since the only positive identification of him as the perpetrator was unreliable:

> The defendant points out that Tracey was the only witness who identified the defendant as the shooter; however, Tracey recanted his videotaped statement at trial and asserts that Tracey "had reason to falsely name [the defendant] as the shooter[.]" The defendant contends that Tracey "needed someone to blame other than himself."

*Id.* at 868. Similarly, in the present case, the Defendant claims Sara originally lied to police so that the Defendant would be forced to go into rehab. Despite the inconsistent statement in *Williams*, this court found the evidence was sufficient to identify Williams as the perpetrator:

> Although Tracey recanted his videotaped statement at trial, the statement itself wherein he identified the defendant as the shooter was played for the jury and was available for them to consider as substantive evidence. As the finder of fact, the jury was free to reject Tracey's recantation and to accept his videotaped statement that the defendant was the shooter.
>
> The State offered other circumstantial evidence that, if accepted by the jury, supported Tracey's initial identification of the defendant

18

as the perpetrator, such as Ms. Leday's testimony that she saw the defendant when the shooting occurred, supports a conclusion that the defendant was present at the scene of the crime. Further, the State offered Ms. Porterfield's testimony that Tracey hysterically told her that "[m]y cousin, Little C, shot that man. I think he killed that man[,]", which if credited by the jury, tends to support the veracity of Tracey's videotaped statement and not his later recantation.

*Id.* at 869.

In the present case, the jury not only heard the evidence that corroborated Sara's initial statement to police identifying the Defendant as the perpetrator, but the jury also heard evidence that discredited Sara's recantation at trial. At trial, Sara testified that she waited until the Defendant was out of rehab to tell police he was not the person who stole the truck. On cross-examination, however, she admitted that she waited until after she and the Defendant were married, shortly before trial, to recant her statement to police. We find that this discredits her claim that she framed the Defendant only to force him into rehab and bolsters the State's theory that she changed her story for the purpose of keeping her husband out of jail. The jury heard the evidence as to Sara's "scheme" and was able to make a credibility determination. Additionally, Sara testified she stole the truck, and the truck had a standard transmission. The owner of the truck, however, testified the truck had an automatic transmission. Based on the foregoing, we find that the evidence was sufficient for a reasonable juror to find that the Defendant was the perpetrator.

Additionally, the Defendant argues that Sara's testimony should be looked upon with "great caution" because she acted as the Defendant's accomplice. The cases cited by the Defendant provide for a "great caution" jury instruction to be given to the jury when the testimony is not supported by corroborating evidence. As discussed above, there was evidence to corroborate Sara's initial statement to

19

police.  Thus, we find that a "great caution" jury instruction was not necessary in this case.

Finally, the Defendant argues that Sara's trial testimony (wherein she stated that she stole the motor vehicle in question) should be believed over her initial statement (wherein she stated that the Defendant stole the motor vehicle) since the trial testimony was given under oath.  As discussed previously, it was not erroneous for the jury to consider Sara's initial statement to police as substantive evidence since it was corroborated by other evidence at trial.  The jury was able to hear both Sara's initial statement and her trial testimony (in which she recanted her initial statement) and make its own credibility determination.

*Insufficiency of the Evidence as to Elements*

In addition to challenging the identity of the Defendant as the perpetrator, the Defendant also challenges the sufficiency of the evidence as to the elements of simple burglary and theft of a motor vehicle valued at $1,500.00 or more.  We will address each offense separately.

*Simple Burglary*

Louisiana Revised Statutes 14:62 provides in pertinent part:

> A.  Simple burglary is the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery, with the intent to commit a felony or any theft therein, other than as set forth in R.S. 14:60.

The State's theory of the case for simple burglary is that the Defendant entered into Mr. Manuel's warehouse without Mr. Manuel's permission and with the intent to get the keys to steal Mr. Manuel's truck.  The Defendant argues that there is no evidence of unauthorized entry into Mr. Manuel's warehouse nor is there any evidence that the Defendant committed a theft while in the warehouse

20

(i.e., no evidence the Defendant retrieved the keys to the vehicle from inside the warehouse).

However, there was an alternative theory presented to the jury in the trial court's instructions. As the trial court instructed the jury, unauthorized entry into a *vehicle* is an element of simple burglary. The trial court also instructed the jury that it must find the Defendant entered a "structure" located at Mr. Manuel's address but did not specify the "structure." "A jury is not constitutionally required to agree on a single theory to convict a defendant where it is instructed as to alternative theories." *State v. Roussel*, 00-192, p. 15 (La.App. 5 Cir. 7/25/00), 767 So.2d 811, 817-18, *writ denied*, 00-2558 (La. 10/5/01), 798 So.2d 960. Based on the trial court's instructions, we find that the Defendant's unauthorized entry into the truck with the intent to steal the truck was sufficient to satisfy the elements of simple burglary.

In *State v. Craig*, 32,209 (La.App. 2 Cir. 8/18/99), 747 So.2d 604, the second circuit held the evidence was sufficient to find Craig guilty of simple burglary when Craig entered a vehicle without authorization and tried to steal the vehicle. The court rejected Craig's argument that he could not be found guilty of simple burglary since he intended to steal the entire vehicle, not commit a theft "therein:"

> Defendant further argues that he could not have committed a simple burglary because the evidence only showed that he was trying to steal the vehicle, not commit a felony or theft ***"therein."*** While defendant poses an interesting question, i.e., whether the theft or attempted theft of an entire movable constitutes a theft therein, the fact remains that if someone is inside a vehicle attempting to steal that vehicle, his intent is to commit a theft therein, not only of the contents but of the vehicle itself. See *State v. Augustus*, 93-406 (La.App. 5th Cir. 02/23/94), 633 So.2d 783; *State v. Pierce*, 450 So.2d 730 (La.App. 5th Cir. 1984).

*Id.* at 606.

Similarly, in *State v. Morris*, 614 So.2d 180 (La.App. 3 Cir. 1993), this court addressed the sufficiency of the evidence as to four offenses that arose out of the theft of a truck from a Leesville automobile dealership. Morris was acquitted of one count of theft but convicted of the remaining counts: simple burglary, unauthorized use of a movable valued over $1,000.00, and simple criminal damage to property valued under $500.00. *Id.* This court found that when Morris crawled into the cab of a truck with the intent to commit a theft of the truck or any of its parts, or with the intent to commit a felony, such as unauthorized use of a movable, he was committing simple burglary. *Id.* The court noted Morris did not have the authority or consent of the owner of the truck to enter or use the truck. *Id.* "The fact that defendant immediately started the truck and drove it off the McRae Ford lot, asking another person to help him hide the truck, establishes defendant entered the truck with the intent to commit a theft or other felony." *Id.* at 184. Thus, this court found the evidence was sufficient to sustain Morris' conviction for simple burglary. *Id.* As for Morris' conviction of unauthorized use of a movable, the court found that when Morris drove the truck out of the dealership and then abandoned the truck, Morris committed unauthorized use of a movable. *Id.*

Likewise, we find that the Defendant in the present case committed simple burglary when he entered the truck with the intent to steal the truck. This intent was evidenced by his actual taking of the truck without authorization. Then, the Defendant committed the separate offense of theft of a motor vehicle when he drove the truck and parked it at another place.

Since this may raise double jeopardy concerns, we will briefly discuss this issue. First, we note that in *State v. Thomas*, 95-1646 (La.App. 3 Cir. 5/8/96), 680

22

So.2d 37, this court addressed Thomas' claim that his convictions violated double jeopardy since he was convicted of three separate felonies arising out of the same criminal episode.[1] Ultimately concluding no double jeopardy violation occurred, this court noted that in *Morris*, the defendant was convicted of three separate felonies committed during a continuous course of conduct:

> In the case of [*Morris*], the defendant was convicted of three felonies – simple burglary, unauthorized use of a movable, and simple criminal damage to property – all arising from his actions of entering a car dealer's lot, kicking out the rear window of a truck, entering the truck to "hot wire" it, and driving away with the truck. The defendant's actions took a few minutes, but he was convicted of the three different crimes committed during his continuous course of conduct.

*Id.* at 45.

In *State v. Solomon*, 379 So.2d 1078 (La.1980), the supreme court addressed whether double jeopardy prevented Solomon from pleading guilty to simple burglary of a vehicle when he had previously been convicted of theft of a watch from the same vehicle. Both the burglary and theft charges stemmed from the same incident wherein the defendant entered a vehicle on November 28, 1978. *Id.* The court noted the crime of burglary was completed upon entry into the vehicle with the intent to commit a theft therein. *Id.* The theft, however, did not occur until Solomon actually took the watch from the glove compartment. *Id.* Addressing the double jeopardy concern, the court stated:

> This distinction makes it clear that burglary of the automobile and the theft of the watch were two separate and distinct offenses and therefore, the conviction of one would not bar a conviction of the other on the grounds that the defendant would be placed twice in jeopardy for the same offense.

*Id.* at 1080.

---

[1] The felonies for which Thomas was convicted were aggravated escape, armed robbery, and possession of a firearm by a convicted felon. *Thomas*, 680 So.2d 37.

Likewise, we find that the Defendant's protection against double jeopardy does not prohibit him from also being convicted of the theft of that same motor vehicle. Under the rationale of *Solomon*, the offense of simple burglary and theft of a motor vehicle were two separate and distinct offenses.

*Theft of a Motor Vehicle Valued at $1,500.00 or More*

As for theft of a motor vehicle, the Defendant contends that the evidence was insufficient to prove the Defendant took the motor vehicle, insufficient to prove he intended to permanently deprive the owner of the vehicle, and insufficient to prove the value of the truck was $1,500.00 or more.

Louisiana Revised Statutes 14:67.26 provides in pertinent part:

> A. Theft of a motor vehicle is the intentional performance of any of the following acts:
>
> (1) The taking of a motor vehicle, which belongs to another, either without the owner's consent or by means of fraudulent conduct, practices, or representations, with the intention to permanently deprive the owner of the motor vehicle; or
>
> . . . .
>
> C.(1) Whoever commits the crime of theft of a motor vehicle when the misappropriation or takings amounts to a sum of one thousand five hundred dollars or more shall be imprisoned, with or without hard labor, for not more than ten years, or may be fined not more than three thousand dollars, or both.
>
> (2) Whoever commits the crime of theft of a motor vehicle when the misappropriation or taking amounts to a sum of five hundred dollars or more but less than one thousand five hundred dollars shall be imprisoned, with or without hard labor, for not more than five years, or may be fined not more than two thousand dollars, or both.
>
> (3) Whoever commits the crime of theft of a motor vehicle when the misappropriation or taking amounts to a sum of less than five hundred dollars shall be imprisoned for not more than six months, or may be fined nor more than one thousand dollars, or both.

As for the Defendant's argument that the State failed to prove the Defendant took the truck with the intent to permanently deprive the owner of the truck, this claim lacks merit. Sara's initial statement proves the element of taking. The truck was found exactly where Sara said it would be found. The Defendant contends that there was no testimony regarding the Defendant's attempt to sell the truck or strip the truck for parts. The Defendant further notes that the owner of the truck had not reported the truck missing. Nothing in the record, however, indicates that the Defendant intended to give the truck back to the owner. The Defendant took the truck and parked it at another place. Thus, these arguments lack merit. *See State v. Mitchell*, 50,188 (La.App. 2 Cir. 11/18/15), 181 So.3d 800, where the second circuit found Mitchell had the intent to permanently deprive the owner of a four-wheeler when Mitchell took the four-wheeler away from the owner's residence and hid when he saw a police officer's spotlight; *State v. Kennerson*, 97-391 (La.App. 3 Cir. 10/8/97), 702 So.2d 860, *writ denied*, 97-2850 (La. 3/27/98), 716 So.2d 884, where this court found Kennerson intended to permanently deprive the owner of her vehicle when the vehicle was taken from the owner's carport, the vehicle was recovered in another town, the vehicle was gone for approximately two weeks, the steering post was broken, and Kennerson made no attempt to return the car; and *State v. Treadway*, 97-901 (La.App. 5 Cir. 3/25/98), 710 So.2d 1121, *writ denied*, 98-1634 (La. 9/25/98), 725 So.2d 490, and *writ denied*, 00-1197 (La. 1/12/01), 780 So.2d 1067, where the fifth circuit found Treadway intended to permanently deprive the dealership of a car when Treadway drove off without permission, the vehicle was recovered three days later in New Orleans, and there was no showing that Treadway was the person who told law enforcement where the car could be found.

The Defendant also argues that the evidence was insufficient to prove the value of the vehicle:

> Value was an essential element of the offense and was required to be proven by the State beyond a reasonable doubt. Robert Manuel testified that he believed he purchased the 1999 GMC Sonoma truck for twenty-one hundred dollars about five years earlier. The truck was a one-fourth truck - not a full-size truck - and had about 160,000 miles on it. The truck was a basic model and was used as a spare to haul parts to jobs. No photographs were taken of the truck to show its condition, but Mr. Manuel agreed it was not kept in the same condition as his personal vehicles. Mr. Manuel testified that the truck had four tires and a working air conditioner. Over the defense's objection, the court allowed Mr. Manuel to testify that he had looked the value up on NADA and estimated the truck's value at eighteen hundred dollars. No documentation supporting this value was admitted into evidence. . . .
>
> The State did not present any documentation as to the value of the 1999 Sonoma truck. On cross-examination of the owner of the truck, the defense questioned the condition of the truck and, apparently after inputting information based on the owner's response into a computer, asked Mr. Manuel if he would be surprised to learn that the value of a one-half ton 1999 GMC Sonoma was fourteen hundred dollars. Mr. Manuel replied, "No." Mr. Manuel also admitted that it was possible the value had depreciated more than $600 in the five years since he purchased the truck.

(citations omitted). As stated previously, the defense counsel moved for a post-verdict judgment of acquittal based on the insufficient evidence of the value of the truck. The trial court denied the motion.

The Defendant further asserts that the State offered nothing other than the owner's testimony as to the value of the truck. This testimony, appellate counsel contends, was not supported by any photographs, expert testimony, or documentation. The Defendant cites *State v. Williams*, 598 So.2d 1265 (La.App. 4 Cir.), *affirmed in part, modified in part and remanded*, 610 So.2d 129 (La.1992),[2] wherein the fourth circuit found that the State failed to present reliable evidence of

---

[2]We note that the supreme court affirmed the court's decision as to insufficiency of the evidence but remanded for entry of a lesser included verdict.

the value of the property stolen. The only evidence of value in *Williams* was the testimony of the car owner that she had purchased the car in 1980 for $25,200.00. *Id.* The owner also testified she had unspecified maintenance problems with the car, and she intended to trade it in. *Id.* When the car was recovered, "it had a dent on the left front side and a hole in the steering column." *Id.* at 1266. The fourth circuit found the "[s]tate failed to introduce any photographs, estimates, original bill of sale or testimony to indicate the value of the car at the time of the theft." *Id.* at 1267. Thus, the court found, "the State presented no trustworthy evidence of any kind to indicate the car's worth." *Id.* Reversing Williams' conviction, the fourth circuit stated:

> When the degree of the crime is based on the value of the property stolen, the State must present more than the self-serving testimony of the owner of the property to meet its burden of proof on this issue. The State failed to present reliable evidence of the value of the property in this case.

*Id.*

Since *Williams*, the fourth circuit has clarified that the "self-serving testimony of the owner is sufficient if it is clear and uncontradicted." *State v. Moses*, 01-909, p. 8 (La.App. 4 Cir. 12/27/01), 806 So.2d 83, 88 (quoting *State v. Hoskin*, 605 So.2d 650, 652 (La.App. 4 Cir. 1992)). Likewise, in *Kennerson*, 702 So.2d at 863, this court found an owner's testimony is generally sufficient to prove value:

> In *State v. Dilworth*, 358 So.2d 1254, 1256-57, the court stated the following concerning evidence sufficient to prove value:
>
> > In *State v. McCray*, La., 305 So.2d 433 (1974), we stated: "Unless it is shown the owner lacks knowledge of the value of a movable [furniture], his testimony as to value is generally admissible, with its weight being left to the jury. 3 Wigmore on Evidence, Section 716 (Chadbourn ed., 1970)."

As expressed in 3 Wigmore on Evidence, Section 716 (Chadbourn ed. 1970), the rule concerning the ability of the owner to place a value upon his movable property is:

> "The *owner of an article*, whether he is generally familiar with such values or not, ought certainly to be allowed to estimate its worth; the weight of his testimony (which often would be trifling) may be left to the jury; and courts have usually made no objections to this policy."

> "However, where it appears (either expressly or by reasonable inference) that the owner in fact lacks knowledge of the particular value at issue, his opinion may be ruled inadmissible."

> . . . It is not necessary that an owner be qualified as an expert in order to testify as to the value of the thing owned by him. Here the owner was not shown to lack knowledge of the value of the thing stolen. Thus, the owners' testimony as to the value of the fence was properly admitted over his objection that they were not experts. *State v. Curtis*, La. 319 So.2d 434 (1975); *State v. McCray, supra.*

In the present case, the owner of the truck testified that, at the time it was stolen, the truck ran well, had four good tires, had a working air conditioner, and had all systems working. The owner believed he paid $2,100.00 for the truck, and he had the truck for at least five years. Additionally, the owner looked on the NADA website, which estimated the truck to be worth about $1,800.00. The owner stated that he would not be surprised if the NADA valued the rough trade of the truck at $1,400.00. The owner additionally agreed it was possible that the truck had depreciated more than $600.00 since he purchased the truck.

On re-direct, the following colloquy took place regarding the value of the truck:

> Q. Let's talk about the value. I'm gonna use the same guides that Mr. Fuselier pulled up. Mr. Fontenot would it surprise you to know that the rough trade in is $1,400.00 dollars but the average trade in is $2,100.00 dollars. Does that sound about right?

A. Yeah. I mean I don't know.

Q. And a clean trade in is $2,675.00 dollars and a clean retail is $4,600.00 hundred dollars. So your estimate of $1,800.00 hundred dollars is on the low end correct?

A. Yeah.

Although the owner was not completely certain of the value of the stolen truck, we find that the owner's testimony was sufficient for the jury to make an evaluation. Obviously, the jury chose to believe that the truck had a value of at least $1,500.00. Considering the testimony presented, we find that the jury's determination was reasonable.

For the foregoing reasons, we find that the evidence was sufficient to find the Defendant was the perpetrator of the crimes committed. We further find that the evidence was sufficient to convict the Defendant of simple burglary and theft of a motor vehicle valued at $1,500.00 or more.

## ASSIGNMENT OF ERROR NUMBER THREE

In this assignment of error, the Defendant asserts that his trial counsel erred in failing to object to the jury instructions in the present case because those instructions "failed to instruct the jury to treat the statement of the accomplice with great caution." Additionally, he alleges that he was prejudiced by the lack of instruction to the jury as to the State's burden of proof when the defense of misidentification is raised.

*Legal Standard for Ineffective Assistance of Counsel*

A criminal defendant is guaranteed the effective assistance of counsel. United States Sixth Amendment; La. Const. art. I, § 13; *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Washington*, 491 So.2d 1337 (La.1986). To establish a claim of ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that

29

counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. *Strickland v. Washington*, *supra*; *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." *State v. Ratcliff*, 416 So.2d 528, 531 (La.1982).

A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. *E.g.*, *State v. Prudholm*, 446 So.2d 729 (La.1984). However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate. *E.g.*, *State v. Hamilton*, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35.

*State v. Bright*, 98-398, pp. 40-41 (La. 4/11/00), 776 So.2d 1134, 1157, *reversed on other grounds*, 02-2793 (La. 5/25/04), 875 So.2d 37.

*Great Caution Jury Instruction*

The Defendant asserts that trial counsel was ineffective for not objecting to the trial court's failure to give the jury the "great caution" jury instruction as to accomplice testimony. First, we find that the jury instruction given to the jury in the present case was sufficient. The trial court instructed the jurors as follows:

As jurors you alone determine the weight and credibility of witnesses and of the weight their testimony deserves. You should scrutinize carefully the testimony and the circumstances under which the witness has testified. In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the state or the defendant, and the extent to which the testimony is supported or contradicted by other evidence. If you believe any witness has lied deliberately to deceive you, then you may disregard all his testimony. The testimony of a witness may be discredited by showing that the witness made a prior statement, which contradicts or is inconsistent with his present testimony.

This court has found a similar instruction to be sufficient. In *State v. Guillory*, 97-179, p. 40 (La.App. 3 Cir. 3/11/98), 715 So.2d 400, 422, *writ denied*, 98-955 (La.

10/9/98), 726 So.2d 17, the defendant requested the following proposed jury instruction:

> The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an accomplice or a snitch who provides evidence against a defendant for partial immunity from punishment, or for pay, or for other personal advantage. You should weigh this testimony with great care and caution and suspicion.

> In judging the testimony of accomplices and snitches and deciding on what weight – if any – you should give this testimony, you should look upon it with distrust and suspicion and you should determine whether the testimony has been affected by his interest in this matter or his prejudice against the defendant. In deciding whether you believe the testimony of any accomplice or snitch in this case you should keep this in mind.

Instead of giving the above proposed instruction, the trial court in *Guillory* instructed the jury as follows:

> As jurors you alone determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and of the weight their testimony deserves, you should scrutinize carefully the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against the State or the Defendant, and the extent to which the testimony is supported or contradicted by other evidence.

*Id.*

Finding the trial court's refusal to include Guillory's requested charge was not error, this court stated:

> [Louisiana Code of Criminal Procedure Article] 807 provides that "a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given." We find that the charge given to the jury adequately explained their duty to determine credibility and the refusal to include the Defendant's requested charge was not error.

*Id.*

31

Because the charge given in the present case was similar to the charge given in *Guillory*, we find that the trial judge adequately explained to the jury its duty to determine credibility; thus, the trial judge's failure to include the requested "great caution" charge was not error. Consequently, trial counsel's failure to object was likewise not error.

Additionally, we find that a "great caution" jury instruction was not necessary in the present case:

> Such "great caution" instructions are required when a case involves uncorroborated accomplice testimony. However, such instructions are not mandatory where an accomplice's or snitch's testimony is materially corroborated. Testimony is materially corroborated "if there is evidence that confirms material points in an accomplice's tale, and confirms the defendant's identity and some relationship to the situation."

*State v. Divers*, 38,524, p. 24 (La.App. 2 Cir. 11/23/04), 889 So.2d 335, 352-53, *writ denied*, 04-3186 (La. 4/8/05), 899 So.2d 2, *cert. denied*, 546 U.S. 939, 126 S.Ct. 431 (2005) (citations omitted). As discussed previously, Sara's initial statement to police was corroborated. Furthermore, the Defendant may not have wanted the jury to view Sara's testimony with "great caution" since her trial testimony exonerated him. Thus, we find that the Defendant failed to prove trial counsel was ineffective for not objecting to the lack of a "great caution" jury instruction.

*Misidentification Jury Instruction*

The Defendant also asserts that trial counsel was ineffective for not objecting to the trial court's failure to instruct the jury as to the State's heightened burden of proof in identity cases. Since the Defendant claims he was not the person who committed the crimes in the present case, he contends that the State was required to negate any reasonable probability of misidentification.

Acknowledging the trial court instructed the jury as to the State's burden of proof, the Defendant contends that the trial court failed to instruct the jury as to the extra burden of proof in misidentification cases.

The Defendant further asserts that the trial court's instructions misled the jury and impermissibly shifted the burden to the defense to prove misidentification when it instructed the jury as follows: "The rule as to circumstantial evidence is assuming every fact to be proved that the evidence tends to prove in order to convict, it must exclude every reasonable hypothesis of innocence. The burden of proof is upon him alleging the existence of a fact."

We find that a "reasonable probability of misidentification" jury instruction was not necessary in the present case since there was no reasonable probability of misidentification. This was not a case where someone could have mistakenly identified the Defendant as the perpetrator. The real issue was the jury's choice to believe Sara's initial statement to the police or her recantation at trial. Thus, we find the Defendant failed to prove his counsel was ineffective for not objecting to the trial court's failure to so instruct the jury.

For the foregoing reasons, this assignment of error lacks merit.

## DECREE

The Defendant's convictions are affirmed.

**AFFIRMED.**