# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-101

**STATE OF LOUISIANA**

**VERSUS**

**DEXTA ZAYSHAWN HALL**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 355,837
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Van H. Kyzar, Sharon Darville Wilson, and Gary J. Ortego, Judges.

**AFFIRMED.**

**Hon. J. Phillip Terrell, Jr., District Attorney**
**Kelvin G. Sanders, Assistant District Attorney**
**Ninth Judicial District Court, Parish of Rapides**
**P.O. Box 7358**
**Alexandria, LA  71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Annette Roach**
**Louisiana Appellate Project**
**P.O. Box 6547**
**Lake Charles, LA 70606-6547**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Dexta Zayshawn Hall**

**WILSON, Judge.**

A jury found Defendant, Dexta Zayshawn Hall, guilty of second degree murder, in violation of La.R.S. 14:30.1. The trial court sentenced Mr. Hall to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. Mr. Hall now seeks review of his conviction. For the following reasons, we affirm the conviction.

## I.

## ISSUES

We must decide:

(1) whether when viewed under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) standard, the evidence was insufficient to prove beyond a reasonable doubt that Mr. Hall participated in the killing of Kevin Hammond, Jr.;

(2) whether the trial court erred when it denied Mr. Hall's motion to dismiss panel two of the venire after the prosecution asked a venireman if he had an opinion as to the guilt or innocence of the defendant and the venireman, who had earlier stated that he had followed the case on social media and law enforcement websites, expressed that he was biased based on previous convictions and charges;

(3) whether counsel rendered ineffective assistance below the standard required by the Sixth Amendment when he failed to either request a "great caution" jury instruction or to object to the court's failure to give a "great caution" jury instruction because the testimony of either co-defendant was not materially corroborated by other evidence in the case. Whether counsel further rendered ineffective assistance when he failed to request the jury be instructed that prior inconsistent statements could be considered for impeachment only and not as substantive evidence; and

(4) whether the court erred in permitting the State to recall its designated case agent in its case-in-chief after the agent had been allowed to remain in the

courtroom during the testimony of several witnesses.

## II.

## <u>FACTS AND PROCEDURAL HISTORY</u>

On the evening of November 23, 2021, the victim, Kevin Hammond, Jr. received messages to contact Charley Brown about a party at the Loblolly apartments in Alexandria. Mr. Hall was also in attendance at this party. Shortly after midnight that same night, Corporal Andre Williams of the Alexandria Police Department was dispatched to Futrell Street in response to reports of a car running off the road. The area was heavily wooded, unlit, and only contained four houses. Upon arriving at the scene, Corporal Williams found an abandoned vehicle parked along the tree line. While inspecting the immediate vicinity of the vehicle, Corporal Williams discovered a single croc shoe on the road which prompted him to investigate the area further. Corporal Williams then discovered the body of Kevin Hammond, Jr. lying face down on the ground in the woods. Mr. Hammond had no pulse. Medics arrived and observed several entry wounds on the front side of his body. Mr. Hammond was pronounced dead at the scene. An autopsy determined Mr. Hammond had suffered between eight and eleven gunshot wounds.

On July 26, 2022, Mr. Hall was charged by bill of information with one count of second degree murder for the murder of Kevin Hammond, Jr. along with two codefendants, Del'trevious Zyshon Conston and Charley Natija Brown. Mr. Hall entered a plea of not guilty on September 9, 2022. Jury selection began on June 27, 2023. After a trial, a verdict of guilty as charged was rendered on June 29, 2023. On July 17, 2023, the court imposed a life sentence at hard labor, without benefits. A notice of appeal was filed on August 1, 2023, and granted on August 2, 2023.

## LAW AND DISCUSSION

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent. The minutes of sentencing, however, are in need of correction.

The court minutes state that the trial judge imposed the sentence without benefit of probation or suspension, but the minutes fail to state that the trial court also prohibited parole. According to the sentencing transcript, the trial judge imposed the sentence without benefit of parole, probation, or suspension of sentence. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, we order the trial court to correct the sentencing minutes to accurately reflect the trial court's imposition of Mr. Hall's sentence without benefit of parole as well as without benefit of probation or suspension of sentence.

### INSUFFICIENT EVIDENCE

In his first assignment of error, Mr. Hall contends the State failed to prove beyond a reasonable doubt that he was at the scene of, discharged a weapon during, or was otherwise a principal to the murder of Kevin Hammond, Jr. Mr. Hall contends that the forensic evidence indicates only two weapons were employed in the murder, that the statements of Mr. Hall's two co-defendants tying him to the murder were not materially corroborated by other available evidence, and that there are two other individuals who are more plausibly tied to the shooting of Mr. Hammond. The State counters that the testimony of three fact witnesses established that Mr. Hall was armed and either at or near the scene of the murder and that the

testimony of the fact witnesses was corroborated by the available forensic evidence as well as law enforcement and expert testimony. Thus, there was sufficient evidence that Mr. Hall either participated in or was a principal to the murder.

When a defendant challenges the sufficiency of the evidence to support his conviction, that issue must be resolved first. *State v. Hearold*, 603 So.2d 731 (La.1992). The analysis for sufficiency of the evidence is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson,* 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Louisiana Revised Statutes 14:30.1(A) defines second degree murder, in relevant part, as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Louisiana Revised Statutes 14:24 provides that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Regarding the matter of principal liability:

> Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state, and the mental state of one defendant may not be imputed to another defendant. Thus, mere

presence at the scene of a crime does not make one a principal to the crime. **However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention.** *State v. Page*, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09-2684 (La. 6/4/10), 38 So.3d 299.

*State v. Alexander*, 21-641, p. 4 (La.App. 3 Cir. 5/25/22), 362 So.3d 599, 604, (emphasis added) (quoting *State v. Petty*, 12-278, p. 11 (La.App. 5 Cir. 10/30/12), 103 So.3d 616, 623).

*Evidence Presented*

The State put forward 10 witnesses: (1) Michael Stelly (North Louisiana Crime Lab, firearm forensics); (2) Corporal Andre Williams (Alexandria Police Department, first officer at scene of murder); (3) Sergeant Alan Stokes (Alexandria Police Department, senior officer at scene of murder); (4) Detective Chad Jeansonne (Alexandria Police Department, Lead Investigator and case agent); (5) Detective Thomas Rodney (Alexandria Police Department, Phone/Text Investigator); (6) Corporal Chris Jenkins (Alexandria City Police, Crime Scene Investigator) (7) Dr. Christopher Tape (Forensic Pathologist, conducted the autopsy); (8) Reann Johnson (associate of Mr. Hall, witness on the night of the murder); (9) Charley Brown (codefendant); and (10) Del'trevious Conston (codefendant). Defense called two witnesses, Kimberly Woods (associated with Tyrone Donnel Porter) and Christopher Od'Neal (Mr. Hall's cousin).

Detective Jeansonne testified that from the start, police suspected that this was not an armed robbery and that there were multiple participants. The latter was due to the casings originating from the passenger side of the vehicle and numerous shoe impressions on the road. The former was suspected because Mr. Hammond's pockets were not turned out and he retained his possessions, including money, jewelry, multiple forms of identification, and his social security card. The victim

5

sustained between eight and eleven gunshot wounds, the "vast majority" of which were inflicted from the right side, and at least one of them was consistent with being shot while trying to exit a vehicle.

Two bullet holes were found in the vehicle, one of which was recovered from the driver's side door, whose trajectories are consistent with being fired from the passenger's side. Eighteen 9 mm cartridges were initially found at the crime scene, including fourteen Luger's and four Sellier and Bellot's. Corporal Chris Jenkins, the crime scene investigator, explained that "[u]sually suggests two shooters. . . or two possible weapons[.]" One of these weapons, a 9 mm Smith & Wesson pistol belonging to Reann Johnson, was subsequently turned over to the Grant Parish Sherrif's Office by a local fisherman. Since all the bullets found in the victim came from two 9 mm weapons and all the cartridges from the scene came from two 9 mm weapons, forensics concluded that two 9 mm weapons were involved in the shooting.

Location data from Mr. Hammond's phone showed that he was in the rough vicinity of his own house prior to 10:00 pm the night of the murder, before proceeding to the area around Loblolly Lane around 11:00 pm. He remained in the Loblolly area for 20 minutes before the phone showed him moving to Futrell Street, on the other side of town. The last movement data before his phone was turned off showed movement towards MacArthur Drive, which was near the residence of Tyrone Porter. It was not stated on the record how long the phone remained at Futrell Street, but Corporal Andre Williams arrived at Futrell Street close to midnight whilst Sergeant Alan Stokes arrived sometime later at 12:30 am.

Police interviewed Mr. Hammond's family the morning after the murder, following up on the address listed on both his identification and from the results of a license plate search on the abandoned vehicle. Mr. Hammond's sister, Desiree Hammond, provided detectives with Mr. Hammond's Facebook account and the

6

name of Charley Brown, who Desiree suspected was involved. The family also identified Del'Trevious Conston as an associate of his, as they had previously lived together in Natchitoches. Mr. Hammond's Facebook account showed numerous messages from Makayla Lachney early in the evening urging him to contact Charley Brown in connection with a party occurring at an apartment complex at Loblolly. There were also messages from Ms. Brown to Mr. Hammond, but they were subsequently deleted on Ms. Brown's end.

The Grant Parish Sherrif's Office informed detectives in February of 2022 that a discarded firearm discovered by a local fisherman was possibly related to this case. This was confirmed by subsequent firearms testing. The owner of the weapon was Reann Johnson, who lived at the Loblolly apartments. Ms. Johnson testified that she was hosting a party at her residence the night of the murder that was attended by both Ms. Brown and Mr. Hall, both of whom carried firearms. They were accompanied by Ms. Brown's girlfriend and an unidentified black male, about Ms. Johnson's height, who also had a firearm. She does not know exactly when her gun and the lockbox it came with went missing, but Ms. Brown was a frequent house guest who would have access to her house when she was not present. When cross examining her, defense counsel noted that Ms. Johnson did not mention the guns when initially interviewed by police. Ms. Johnson stated that she did not see Ms. Brown, or the others, come and go. Ms. Brown later testified that she had Ms. Johnson's gun on her at the time of the murder but was nonspecific about how she came to possess it.

Charley Brown was initially interviewed by police on December 1, 2021, where she was initially cooperative and confirmed she was at the party the night of the murder and had been with the victim. Shortly before the start of Mr. Hall's trial, she pled guilty to a reduced charge and agreed to testify as part of her plea. At trial,

7

Ms. Brown described the chain of events as follows: She testified that she asked Mr. Hammond to come pick her up from the party on Loblolly and drive her to Futrell Street. Although Mr. Hall was at the party with her, she claims he was not in Mr. Hammond's car with her. Instead, she claims he was apparently waiting at Futrell Street along with several other people, including Mr. Porter and Mr. Conston. While using Reann Johnson's weapon, she opened fire on the victim while standing outside by the passenger side and continued to fire at him as he tried to get out. At the same time, she claims both Mr. Hall and Mr. Porter were armed and standing outside the car on the other side of the vehicle from Ms. Brown, which would mean they were by the driver's side. She claimed that only Mr. Porter discharged his weapon. After the shooting, she claims to have gotten back into a different car with Mr. Hall, Mr. Porter, and Mr. Conston. She denied that Mr. Conston was the driver. The unidentified individual dropped her at her own vehicle and then she drove herself back to the party, where she met Mr. Hall again. At 1:09 a.m., Mr. Porter sent her messages asking her if she got back to her vehicle and she subsequently sent messages to him arranging to pick him up and take him to the party. Data from Ms. Brown's Facebook account showed that she had been in contact with Mr. Porter in the days before and after the shooting. There were no messages in either Mr. Hammond's or Ms. Brown's Facebook account with Mr. Hall.

Police initially interviewed Mr. Conston in April of 2022, when he was incarcerated at DC-1. According to Detective Jeansonne, Mr. Conston had confessed to his involvement in the murder, specifically his role in providing transportation away from the murder and identified Mr. Hall and Ms. Brown as the shooters. He repeated these claims when he pled guilty in October of 2022. At trial, however, he denied that Mr. Hall was present and instead identified Mr. Porter as the other shooter. This prompted the State to designate him as a hostile witness. The

8

State and Mr. Conston have the same explanation for why his story changed between his initial interviews and trial: the threat of intimidation by other inmates. The two sides disagree as to which inmate was threatening him and at which facility. Mr. Conston testified at trial that Mr. Porter was threatening him while he was incarcerated at DC-1 in the same unit as Mr. Porter, and that is why he identified Mr. Hall rather than Mr. Porter as the second shooter. Defense submitted an affidavit that Mr. Conston wrote on Mr. Hall's behalf after Mr. Conston was moved to DC-3 and away from Mr. Porter. The State pointed out, however, that he was only moved to DC-3 after he gave his statement in court and that he told Detective Jeansonne in a subsequent interview at DC-3, conducted after the signing of said affidavit, that it was in fact Mr. Hall who was threatening him, as Mr. Hall was at this time also incarcerated at DC-3.

Detective Jeansonne interviewed Tyrone Porter, Jr. and confronted Mr. Porter with the Facebook messages showing that he was in contact with Ms. Brown in the days before and after the murder. During the interview, held at the Rapides Parish Jail, Mr. Porter confirmed that he was friends with Ms. Brown, but he was otherwise uncooperative and unwilling to discuss the murder of Mr. Hammond. When shown the messages between him and Ms. Brown, he confirmed that he discussed robbing people with Ms. Brown but did not talk about or mention murders. Mr. Porter died prior to trial.

The police offered two competing theories as to the motivation for the killing of Mr. Hammond. The first theory was that Mr. Hammond was murdered on suspicion that he was going to cooperate with police concerning another incident they were all involved in. The second theory, stemming from Mr. Conston's initial statements to the police, is that there was tension between Mr. Hall and Mr.

Hammond concerning Makiya Lachney, the other woman who messaged the victim the night of the murder.

Defense offered two witnesses, Kimberly Woods and Christopher Od'Neal. Kimberly Woods was the mother of Mr. Porter's ex-girlfriend and testified that Mr. Porter had confessed his involvement in the murder to her, but he apparently gave no other details and did not clarify his exact involvement. Christopher Od'Neal is Mr. Hall's cousin and testified that he lived with Mr. Hall at his grandmother's house in Colfax at the time of the murder and that he had picked him up from a party on the morning of "the weekend of November 23rd." He testified that Mr. Hall had claimed to have been at the party all night and had no signs of blood or dishevelment, but Mr. Od'Neal otherwise knew nothing directly about his whereabouts the previous night.

*Analysis*

While there is substantial disagreement surrounding the events leading up to and, especially, after the murder of Kevin Hammond, Jr., the record indicates that Mr. Hammond was killed in a coordinated ambush on Futrell Street shortly before midnight between the night of November 23rd and the morning of November 24th, 2021. The forensic evidence strongly indicates that only two weapons were discharged during the murder and that one of these weapons was the one belonging to Reann Johnson. There is no serious dispute that Charley Brown was one of the shooters and that she played a vital role in both luring Mr. Hammond to the scene of his own death and carrying out the murder. There is also no dispute that Del'Trevious Conston was also involved in the murder, most likely as the getaway driver. Although Ms. Brown tried to downplay the extent to which this murder was planned, the record flatly contradicts her. Ms. Brown admits that she directed Mr. Hammond to Futrell Street due to its isolation and lack of through traffic, ensuring

10

that no third persons would stumble upon the murder. That alone indicates premeditation and some degree of planning. If one accepted her account at face value, all of the other participants in the conspiracy to kill Mr. Hammond were apparently already present, and as one does not just happen to show up on a deserted street on the other side of town at just the right moment in the middle of the night. That too would strongly indicate planning and coordination. Conversely, Mr. Conston testified that the other conspirators, besides himself, traveled with Ms. Brown whilst he was specifically involved to provide transportation from the location. One does not designate a getaway driver in advance by accident. The short time frame that the conspirators could have been on Futrell Street, combined with the physical evidence showing that the conspirators started shooting at Mr. Hammond as he was still in the car or just getting out, provides yet further indication that the intention to murder him was the premeditated rather than spontaneous. There was thus more than sufficient evidence establishing a conspiracy to murder Kevin Hammond, Jr. and that this conspiracy involved, at minimum, Charley Brown and Del'Trevious Conston.

The key factual dispute in this case concerns the other putative participants in the plan to kill Mr. Hammond. While Ms. Brown identified Tyrone Porter as the second shooter, she also testified that Mr. Hall was armed and present. Mr. Conston's initial statements to the police and his plea statements identify Mr. Hall as the second shooter without identifying Mr. Porter as a participant, while at trial he identified Mr. Porter as the second shooter and denied that Mr. Hall participated. The testimony of Reann Johnson, who as the host of the party would have been one of the last people to see Ms. Brown before the murder, claimed Ms. Brown was accompanied by Mr. Hall and an unidentified black male and that all three of them

were armed. As she claimed the unidentified black male was about her height, context suggests that he could very well have been Tyrone Porter, who was 5'6.

If the State was required to prove beyond a reasonable doubt that Mr. Hall shot Kevin Hammond, Jr., the State would have a tough time doing so. While Ms. Brown identified Tyrone Porter as the second shooter, the State's closing argument encouraged the jury to look past that by pointing out that Ms. Brown would not necessarily have been able to identify who the other shooter was, considering she was busy firing her own weapon and how dark the unlit and heavily wooded Futrell Street was, and that it was simply not believable that someone in Mr. Hall or Mr. Porter's position would just stand there with a weapon and not use it. Nonetheless, forensic evidence strongly indicates that there were indeed only two shooters and the weight of evidence offered at trial, both testimonial and physical, makes it impossible to rule out Tyrone Porter as the second shooter.

However, the State need not show that Mr. Hall was the second shooter to prove his culpability in the murder of Kevin Hammond, Jr. The State must prove beyond a reasonable doubt that Mr. Hall either committed or was a principal to second degree murder, the latter of which requires him to have knowingly participated in the execution of the crime; in other words, that he was standing by during the murder of Mr. Hammond and was ready to give some aid if needed to carry out the murder. *Alexander*, 362 So.3d at 356. The State has made this latter showing.

It is the role of the fact finder to weigh the respective credibility of the witnesses and make credibility determinations, and they may accept testimonies in whole or in part. We note that Ms. Brown's testimony is somewhat unreliable and parts of it are not believable. Her denial that there was a plan that night was implausible for reasons already discussed. Several other problematic portions of her

testimony revolve around her claim that numerous other unnamed persons were involved in and around the events of the murder, who in her telling filled in for various roles like procuring and then handing her Reann Johnson's gun, transporting Mr. Hall and Mr. Porter to the scene, and then transporting her, Mr. Hall, Mr. Porter, and Mr. Conston from the scene. These assertions are implausible and, at times, directly contradicted by other evidence in the record, such as Mr. Conston's testimony, who in Ms. Brown's telling does not appear to even have a reason to be at the scene. Nonetheless, not all of her testimony is as easy to dismiss. For example, her narrative explaining how she shot the victim from the passenger side of the car as he tried to escape is consistent with and materially corroborated by the forensic evidence. More importantly, the essential portion of her testimony, that Mr. Hall was an armed participant at the scene, is both internally consistent and was corroborated by Mr. Conston's statements and his prior discussions with law enforcement, as related by Detective Jeansonne. While Mr. Conston's testimony at trial and his affidavit differed from these prior recountings, the jury was free to disregard Mr. Conston's conflicting narratives and accept his numerous earlier statements instead, particularly in light of the plausible explanations that the State offered to explain why Mr. Conston may have changed his testimony at times. The testimony of Reann Johnson offers further reinforcement for Ms. Brown's testimony, as it places Mr. Hall, Ms. Brown, and possibly Mr. Porter together at her party shortly before the murder, all of whom were armed. There is thus ample evidence in the record to support a finding by the jury that Mr. Hall was armed and present on Futrell Street at the time of Mr. Hammond's murder.

Insofar as the jury makes this finding, the records supports convicting Mr. Hall as a principal to the murder of Kevin Hammond, Jr. Although simple presence at a crime scene is not enough on its own to prove principal liability, there is more

than enough contextual evidence to show that he was a willing participant ready to give aid if needed. As discussed, the record shows that the murder of Mr. Hammond was a planned conspiracy that was deliberately set in an area where third persons would not just stumble across the act. Mr. Hall had no reason to be on Futrell Street that night and it is implausible that he just happened to be there. He was clearly invited to participate and indicated his willingness to do so by showing up at the appointed hour in this prepicked, deserted area whilst sufficiently armed to provide direct assistance if needed. His participation in the conspiracy is further corroborated by him appearing armed side by side with other conspirators, Charley Brown and possibly Tyrone Porter, at Reann Johnson's party shortly before the murder. It strains credulity to suggest that he could have been a present, armed participant accompanying the other conspirators and yet been unaware of what his accomplices were intending immediately upon arrival at Futrell Street. It is thus ultimately immaterial whether he or Tyrone Porter was the second shooter: all that matters is that he was an active participant in the plan to kill Kevin Hammond, Jr. and was ready to lend his armed assistance if needed. There is sufficient evidence in the record to support the jury's conclusion that he was, and therefore this assignment of error lacks merit.

**JURY CONTAMINATION**

In his second assignment of error, Mr. Hall asserts that the trial court erred when it denied his motion to dismiss panel two of the venire due to concerns about contamination. A potential juror, Samuel Guimbellot, indicated he was aware of some of the details of the case from "[s]ocial media and other law enforcement websites that I still have access to[,]" and when the State enquired as to what extent this knowledge affected his judgement, Mr. Guimbellot stated in front of the rest of the panel that he had a bias as to the guilt or innocence of the defendant "[b]ased on

14

previous convictions and charges[.]" The prosecution responded by telling him to "hold that" pending a private discussion with the judge. Mr. Guimbellot did not specify in what manner he was biased in front of the jury, nor did he talk to any of the jurors about what specifically he knew. The trial court denied the motion to dismiss the venire because the State quickly cut off Mr. Guimbellot and because Mr. Guimbellot neither mentioned Mr. Hall's name nor went into any details regarding his bias. Accordingly, the trial court doubted that jurors would make any conclusions based on Mr. Guimbellot's remarks, particularly since he specifically referenced social media as a source, "which all of them have clearly said is not a reliable source." The trial court instead opted to admonish the jury.

Mr. Hall asserts that Mr. Guimbellot's comment was an impermissible reference to other crimes evidence, that there was sufficient evidence that the juror was referring to Mr. Hall in particular, and that other jurors may have impermissibly formed their own biases as a result of his disclosure. The State argues that any potential prejudicial effects from his remarks are minimal, as they lacked any specific details, were interrupted before he could elaborate, and were addressed by the trial court's admonishment to the jury to disregard his statements.

Louisiana Code of Criminal Procedure Article 419 provides, in pertinent part, that, "[a] general venire, grand jury venire, or petit venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race."

The decision to dismiss the venire rests within the trial court's discretion, and Defendant bears the burden of proving the grounds for setting aside the venire. *State v. Carmouche*, 01-405 (La. 5/14/02), 872 So.2d 1020. Proof of prejudice generally requires further examination of the other venire members, and an admonition to the

15

other venire members may cure any potential prejudices so identified. *State v. Lacon*, 19-478 (La.App. 3 Cir. 12/30/19) (unpublished opinion) (citing *State v. Hall*, 43,125 (La.App. 2 Cir. 6/4/08), 986 So.2d 863, *writ denied*, 08-1511 (La. 3/13/09), 5 So.3d 116), *writ denied*, 20-1361 (La. 4/27/21), 314 So.3d 837.

Mr. Hall has not proven that any "irreparable injury" was caused to him by Mr. Guimbellot's remarks. We agree that the mention of other crimes evidence can be prejudicial and was a sound basis to disqualify Mr. Guimbellot. We also agree with Mr. Hall concerning the clarity of who Mr. Guimbellot was referring to, as while the trial court noted there were numerous defendants involved with this trial, there was only one person on trial before this specific jury and the lead question to which Mr. Guimbellot responded only asked about the singular "defendant[.]" Insofar as a juror may have heard and considered Mr. Guimbellot's remark, they would have known who it was referring to. Nonetheless, Mr. Hall has not proven that Mr. Guimbellot's remark actually had a prejudicial effect on him.

Mr. Hall does not appear to have conducted any voir dire specifically to examine whether the rest of the jury pool heard, considered, or was influenced by Mr. Guimbellot's remarks, nor has Mr. Hall identified any admitted jurors who may have been so influenced. As the trial court noted, Mr. Guimbellot's isolated remark was short, somewhat nonspecific, and did not go into any details. Insofar as the jury pool was indirectly examined for potential prejudicial impacts by Mr. Guimbellot's remarks, the examination revealed no such impact. The State spent significant time immediately before and proceeding Mr. Guimbellot's remarks explaining to the jury the potential inaccuracies of media and especially social media coverage, the latter of which was Mr. Guimbellot's stated source, and the importance of setting aside such coverage when making their deliberations. Several jurors explicitly affirmed their understanding of, and agreement to this instruction. No jurors indicated

16

disagreement. Finally, the trial court specifically admonished the jurors to disregard "anything that another juror might say or you think he or she says about the facts of the case or the defendant or the victim or any of the lawyers in the case" whilst reinforcing the point the State had made to them earlier that "something that somebody may have read on social media is, obviously, not credible evidence and can't be considered."

Mr. Hall has not carried his burden to show that he suffered any irreparable harm from Mr. Guimbellot's non-specific remark. Further, any prejudice Mr. Hall may have suffered was properly addressed through the voir dire process and the trial court's admonishment. Accordingly, this assignment of error is meritless.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his third assignment of error, Mr. Hall contends that his trial counsel rendered ineffective assistance when he failed to request or object to the trial court's failure to give a "great caution" charge in the jury instruction. He also asserts prejudice arising from his counsel's failure to ensure that the jury instructions mentioned the restriction on considering Mr. Conston's prior inconsistent statements only for impeachment purposes.

Mr. Hall argues that there was no DNA, fingerprint or other evidence connecting anyone to the physical evidence found at the crime scene. He also argues that no witnesses, aside from the codefendants, tied him directly to the murder, and there was no location or phone data tying him directly to the scene. He asserts that the only independent evidence tying him to the events of the night was an identification at a party beforehand. Thus, Mr. Hall argues that the evidence allegedly connecting him to the shooting was "solely" from the testimony of a codefendant, without material corroboration, and that therefore he was entitled to a "great caution" jury instruction. The State responds that the relevant testimony was

17

materially corroborated by testimony placing Mr. Hall in the rough area of the murder with the codefendant while armed and that Ms. Brown's testimony was at least partially corroborated by available forensic testimony. The State argues that any potential lapses from not requesting the special jury charge relating to Mr. Conston's statements were harmless considering that Mr. Conston's prior statements were themselves corroborated by Ms. Brown's testimony and available forensic evidence, thus allowing the substance of his testimony to be considered.

To prevail on an ineffective assistance of counsel claim, Mr. Hall must show that his trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that the result of the proceeding would have been different but for the unreasonable performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984) and *State v. Washington*, 491 So.2d 1337 (La.1986). Trial courts are required to supply a "great caution" jury instruction for an accomplice's testimony when said testimony is uncorroborated, but such an instruction is not mandatory if there is material corroboration. *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So.2d 749, 761, *cert denied,* 528 U.S. 893, 120 S.Ct. 220 (1999). Material corroboration requires there to be evidence confirming material points in the accomplice's testimony and evidence confirming the defendant's identity and at least some part of his relationship to the situation. *Id.* In *State v. Fontenot*, 16-226 (La.App. 3 Cir. 11/2/16), 207 So.3d 589, this court found an accomplice's testimony concerning the defendant's theft of a truck to be sufficiently materially corroborated when the truck was found exactly where the accomplice said it would be. In *State v. Talbert*, 20-251 (La.App. 3 Cir. 2/3/21), 311 So.3d 1100, this court found an accomplice's testimony placing defendant at the scene of the murder was sufficiently corroborated by available evidence, including forensic data matching the types of guns the

accomplice described defendant using and cell phone data indicating the defendant was in the area.

The relevant portion of the trial court's instruction is as follows:

Weight and credibility of the evidence. As jurors, you alone shall determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and the weight their testimony deserves, you should carefully scrutinize the testimony given and the circumstances under which the witnesses have testified. In evaluating the testimony of a witness, you may consider: (1) His or her ability and opportunity to observe and remember the matter about which he or she testified; (2) his or her manner while testifying; (3) any reasons he or she may have for testifying in favor of or against the state or the defendant, and (4) the extent to which the testimony is supported or contradicted by other evidence.

Issues involving ineffective assistance of counsel are typically relegated to post-conviction relief; however, "[w]hen 'the record discloses evidence needed to decide the issue,' an appellate court may decide it." *State v. Peart*, 621 So.2d 780, 787 (La.1993) (quoting *State v. Ratcliff*, 416 So.2d 528, 530 (La.1982))." Ms. Brown's testimony was sufficiently corroborated by other available evidence. As in *Fontenot* and *Talbert*, pertinent facts in her testimony such as how she shot Kevin Hammond, Jr.: (1) from the passenger side; (2) with Reann Johnson's weapon; (3) while he was trying to exit the vehicle; (4) on Futrell Street; (5) before midnight, have all been verified by forensic and phone data. Reann Johnson's testimony confirmed Mr. Hall's proximity in the area shortly before the murder and his relationship to the situation, which was that he was armed and accompanying Ms. Brown. The trial court's general charge to carefully examine the credibility of witnesses in line with supporting and contradictory evidence appropriately instructed the jury how they should review Ms. Brown's testimony, and a "great caution" instruction was unnecessary.

Mr. Hall's complaint concerning Mr. Conston's prior inconsistent statements also lacks merit. Mr. Hall has not supplied any case law to support his argument. We agree with the State that any potential error was harmless and would fail the

19

second prong of *Strickland*. The relevant portions of Mr. Conston's statement made pursuant to his plea agreement identifying Mr. Hall's role in the murder of Kevin Hammond, Jr. were read in front of the jury and into the record before and independently of Detective Jeansonne's subsequent recall. This was done without objection. Mr. Conston did not deny that he made the statement or its contents, and the essential details of the statements were corroborated by other available evidence. The jury was thus permitted to consider them for substance pursuant to La.Code Evid. art. 801(D)(1)(a).

Further, Mr. Hall's interpretation of the trial court's limitation is overly broad. The trial court's explicit instruction on the record was simply that the prosecution should stick to asking questions relevant to impeachment purposes, which it reiterated during rebuttal testimony. This was in line with *State v. Williams,* 11-1844 (La.App. 1 Cir. 5/23/12), (unpublished opinion) (2012 WL 1900523), *writ denied*, 12-1445 (La. 1/11/13), 106 So.3d 548, which was cited by the trial court. Not only did the trial court not specify a restriction on how the jury could view the rebuttal testimony, but the trial court failed to even mention the jury when discussing the situation or issuing its ruling. Furthermore, the trial court subsequently allowed the defense "leeway" as to the scope of its own questions during cross examination, and it is not clear how an implied limitation on the jury to consider materials for impeachment purposes only is supposed to apply when the defense was authorized to ask questions beyond such purposes. Therefore, since the record does not indicate that the trial court imposed any limitation on how the jury could consider Detective Jeansonne's rebuttal testimony, and because even with such a restriction the jury would have been able to consider the most important parts of his prior statements for substance regardless, the trial court's instruction was sufficient.

Accordingly, as there were no errors with the trial court's instructions to the jury, Mr. Hall's trial counsel was not deficient in failing to challenge them. This assignment of error also lacks merit.

## SEQUESTRATION ORDER

In his final assignment of error, Mr. Hall argues that the trial court erred in allowing the State to recall its case agent during its case in chief, in violation of the sequestration order. Detective Chad Jeansonne was the State's case agent. He testified fourth but was allowed to remain in the courtroom for the remaining witnesses as the case agent. The State requested he be recalled and testify last in its case in chief due to the hostile testimony of Mr. Conston who, as previously noted, recanted his prior statements to police during his testimony. Defense objected at the time, noting that the State already had an opportunity, which it made use of, to cross-examine Mr. Conston with his prior statements to both Detective Jeansonne and the State's attorney and that the State could have simply planned to have Detective Jeansonne testify later in anticipation of Mr. Conston's potentially hostile testimony. The trial court ultimately allowed the State to recall Detective Jeansonne for the "very limited purpose of impeachment" while citing to *Williams,* 11-1844.

Mr. Hall argues that he was denied a fair trial by the ability of Detective Jeansonne to sit through Ms. Brown and Mr. Conston's testimonies and his resulting awareness of "the specific issues he needed to emphasize for the jury in order to discredit Conston's trial testimony." The State argues that the recall, necessitated by Mr. Conston's surprise testimony, was consistent with the rules of evidence. Furthermore, there was little chance of prejudice to Mr. Hall because Detective Jeansonne's testimony was limited to statements made during just one of Mr. Conston's interviews, and Mr. Hall "was given great latitude by the trial court to recross Detective Jeansonne and went well beyond the limited redirect by the state."

21

Louisiana Code of Evidence Article 615(A) provides, in pertinent part, that "[o]n its own motion the court may, and on the request of a party the court shall, order that the witnesses be excluded from the courtroom . . . and refrain from discussing the facts of the case with anyone other than counsel in the case." However, the article does not apply to "a single officer or single employee of a party which is not a natural person designated as its representative or case agent by its attorney." La.Code Evid. art. 615(B). "[I]n order to reverse on grounds that the State's case agent was allowed to testify after other witnesses, there must be prejudice to the defense[.]" *State v. McDowell*, 22-692, p. 14 (La.App. 3 Cir. 3/8/23), 358 So.3d 277, 287. Courts have found such prejudice when the success of the prosecution's case relied heavily on the credibility and effectiveness of the late testifying officer. *State v. Lopez*, 562 So.2d 1064, (La.App. 1 Cir. 1990). In *Williams*, 11-1844, the opinion the trial court relied upon, the first circuit found that the trial court took appropriate measures to minimize the possibility of prejudice to the defendant when it restricted the scope of the recalled case agent's rebuttal to impeachment, the State complied by narrowing the scope of its questioning accordingly, and the defense was able to cross examine the officer. In that case, the law enforcement case agent testified first but was later recalled when one of its witnesses turned hostile.

Mr. Hall has not made a credible showing of prejudice by the violation of sequestration. On the one hand, although it can hardly be argued that Detective Jeansonne was uninfluenced by Mr. Conston's testimony, as he was still in the room and heard Mr. Conston's testimony, the State had already extensively cross-examined Mr. Conston, including by using some of Detective Jeansonne's statements. There was also the prior testimony of Detective Jeansonne, and while specifics of his conversations with Mr. Conston were blocked then on hearsay

22

grounds, what he was permitted to say touched on the broader substance of what Mr. Conston's prior inconsistent statements were and thus put said information in front of the jury. Finally, as in the *Williams* case, the State limited its recall examination to a very limited set of questions pertaining to impeachment, in line with the trial court's limitation, and Mr. Hall was allowed to cross-examine afterwards. Taken together, while the State's case relied heavily on Detective Jeansonne's testimony and his statements relating to Mr. Conston, the primary advantages of his testimony were achieved before the rebuttal, unlike in *Lopez,* where the case officer's late testimony was vital to the case. Further, one portion of Detective Jeansonne's rebuttal testimony that Mr. Hall highlights as specifically prejudicial, his description of Mr. Conston's "purported fear[,]" was aired as a response to Mr. Halls's own cross-examination.

As the State had a valid reason to recall Detective Jeansonne due to the unexpectedly hostile witness, and due to the minimal prejudice his rebuttal testimony likely imposed on Mr. Hall, this assignment of error lacks merit.

IV.

## CONCLUSION

For the foregoing reasons, the conviction of Defendant, Dexta Zayshawn Hall, is affirmed. The trial court is ordered to correct the sentencing minutes to accurately reflect the trial court's imposition of Mr. Hall's sentence without benefit of parole as well as without benefit of probation or suspension of sentence.


**AFFIRMED.**

23